RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

     *v.*

No. 08-5534

ERNEST W. CANIPE,

                *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 07-00064-001—J. Ronnie Greer, District Judge.

Submitted: June 11, 2009

Decided and Filed: June 30, 2009

Before: SUTTON and GRIFFIN, Circuit Judges; LIOI, District Judge.[*]

_____

## COUNSEL

_____

**ON BRIEF:** Clifton L. Corker, Johnson City, Tennessee, for Appellant. Robert M. Reeves, ASSISTANT UNITED STATES ATTORNEY, Greeneville, Tennessee, for Appellee.

_____

## OPINION

_____

      GRIFFIN, Circuit Judge. Defendant Ernest Canipe appeals the district court's denial of his motion to suppress firearm and ammunition evidence seized from his vehicle and his resulting inculpatory statement. He contends that the evidence, which led to his conditional guilty plea and 192-month prison sentence for felon in possession

---

     [*]The Honorable Sara Lioi, United States District Judge for the Northern District of Ohio, sitting by designation.

of a firearm and ammunition contrary to 18 U.S.C. § 922(g)(1), was obtained in violation of his Fourth Amendment rights against unreasonable searches and seizures because his detention was unreasonable, he did not consent to the search of his vehicle, the search exceeded the scope of his alleged consent, and his subsequent statement was tainted by these unconstitutional acts.  We disagree and affirm.

I.

Herman Hagie, an investigator with the Washington County (Tennessee) Sheriff's Department, was the sole witness at the evidentiary hearing before a magistrate judge on Canipe's motion to suppress.  Hagie testified that on June 25, 2007, his supervisor told him that Canipe might be in possession of a firearm.[1]  Hagie knew Canipe, having previously met him when Canipe was in prison and having later arrested him in an unrelated incident.  Hagie was also aware that Canipe had been previously convicted of arson and of attempting to stab a law enforcement officer.

Upon learning that Canipe was expected to check in that day at the probation office in Johnson City but had not yet done so, Hagie attempted to intercept him at the office.  Arriving in his unmarked police vehicle, Hagie saw Canipe in the parking lot and called for backup.  After observing Canipe leave the parking lot without wearing his seatbelt, a violation of Tennessee law, Hagie performed a traffic stop.  The government concedes that Hagie's motive for the traffic stop was to assess whether Canipe possessed a firearm.

Hagie cited Canipe for failing to wear a seatbelt.  The time it took Hagie to write the citation and present it to Canipe was normal, which for that time of day was "[m]aybe even longer" than ten to fifteen minutes.  Sometime during this time, Officer Bevins arrived.  Shortly thereafter, two other officers arrived, totaling four officers at the scene of the traffic stop.

---

[1]Hagie's supervisor apparently learned this information from Canipe's half sister.

After Canipe signed the citation, Hagie returned his driver's license, registration, and proof of insurance.  Immediately thereafter, Hagie asked Canipe whether he had "anything" in his vehicle that might be unlawful or about which Hagie needed to know.  Canipe responded, "No, he didn't think so."  Hagie then inquired whether "it would be all right if I looked in" the vehicle or "[y]ou care if I look?" to which Canipe answered that it "wouldn't be a problem."  After performing a consented frisk, Hagie told Canipe "again that we were going to look through your vehicle, we're going to go through your vehicle, and [Canipe] never commented."

While an officer stood with Canipe between the rear of the truck and the front of Hagie's cruiser – a "short distance" of about ten feet between the two vehicles –  Hagie and Officer Bevins searched the truck.  Hagie found a closed metal box resembling a tackle box on the front floor of the passenger seat and observed the corner of a second plastic box protruding from beneath the seat.  When he moved the seat forward, Hagie discovered that the top of the second box was inscribed with the word "Ruger," which he knew was a company that manufactured firearms.  Hagie opened the Ruger box, observed a handgun inside of it, and placed Canipe under arrest.[2]

At the detention center, Canipe was read his Miranda warnings, signed a waiver of his rights, and gave an incriminating statement.  He timely appeals the district court's order adopting the magistrate judge's recommendation to deny his motion to suppress the evidence seized from his truck, as well as his subsequent inculpatory statement.

II.

We review the district court's factual findings on a motion to suppress for clear error and its legal conclusions de novo.  *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007).  A factual finding is clearly erroneous when, although there may be evidence to support it, we are left with the definite and firm conviction that a mistake has been committed.  *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007) (citation and

---

[2]The metal tackle box contained ammunition, although it is unclear whether the ammunition was discovered before or after the firearm.

quotation marks omitted).  We view the evidence in the light most likely to support the district court's decision.  *Id*. (citations omitted).

A.

First, Canipe challenges the reasonableness of his continued detention and Investigator Hagie's request for consent to search his vehicle following the issuance of the citation.  He contends that Hagie's conduct, unaccompanied by evidence of any other criminal act, exceeded what was reasonably related to the circumstances justifying a typical stop for failure to wear a seatbelt.  We disagree.

We begin by noting that Canipe does not dispute the lawfulness of the initial stop.  Indeed, because Investigator Hagie possessed probable cause to believe that a traffic violation occurred when he observed Canipe not wearing a seatbelt, Hagie's motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine its constitutionality.  *See Whren v. United States*, 517 U.S. 806, 813-19 (1996) (holding that officers' temporary detention of defendants in a "high drug area" under the pretext that defendants were violating traffic laws was not unreasonable where officers had probable cause to believe that defendants committed traffic infractions); *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) ("[P]olice may make a stop when they have probable cause to believe a civil traffic violation has occurred, even if the defendant raises a claim that the stop was pretextual.").

Nevertheless, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  In particular, "[a] lawful traffic stop may become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances."  *Ellis*, 497 F.3d at 612 (citations and internal quotation marks omitted).  Whether the continued detention was unreasonable is not subject to a "bright-line rule," *id*. at 612; rather, the focus is on the "'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *Id*. at 613 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "The totality of the

circumstances analysis permits police officers 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Ellis*, 497 F.3d at 613 (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)).

Guiding this inquiry is our en banc holding in *United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998) (en banc) that "the Constitution does not mandate that a driver, after being lawfully detained, must be released and sent on his way without further questioning" once the detaining officer has concluded the original purpose of the stop. *Id.* at 820, 823 (holding that officers' continued detention of defendant and request to search defendant's vehicle after determining that he was not an impaired driver did not violate defendant's Fourth Amendment rights). *Erwin*'s ruling comports with well-established precedent that "[a] law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and asking him whether he is willing to answer some questions," *id.* at 823 (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983)), or requests the individual's consent to search his vehicle, *Erwin*, 155 F.3d at 823 (citing *United States v. Dunson*, 940 F.2d 989, 994 (6th Cir. 1991)), and "this consent is not vitiated merely because the valid suspicion of wrongdoing for which an individual has been stopped proves to be unfounded or does not result in prosecution and the individual is free to go before being asked," *Erwin*, 155 F.3d at 823 (citing *Ohio v. Robinette*, 519 U.S. 33, 38 (1996)). However, absent reasonable suspicion of criminal activity, a law enforcement officer must allow an individual to leave if he so requests, and any consent obtained by the officer's refusal to permit him to do so is invalid. *Erwin*, 155 F.3d at 823. *See also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.") (internal citations and quotation marks omitted).

Investigator Hagie's continued detention and questioning of Canipe after issuing him the traffic citation were reasonable. Hagie knew Canipe and received reliable information from his sister – through his supervisor – that Canipe was unlawfully possessing a firearm. The stop was not prolonged, Hagie testifying that it was of "normal" duration for a traffic violation at that time of day and much of it was consumed by the purpose of the initial stop, including the need for Hagie to complete the citation and retrieve information from the records dispatch. *See Ellis*, 497 F.3d at 613 (holding that the detention prior to defendant's consent to search was reasonable, in part, because it "was necessitated by the purpose of the initial stop and the need for the trooper to identify the occupants of the vehicle and determine the driver's ability to safely operate the vehicle."). When Canipe signed the citation and Hagie returned his information, thereby concluding the initial purpose of the stop, Canipe neither refused Hagie's immediate request for permission to search the truck nor asked to leave. In fact, Hagie obtained Canipe's consent to search by asking two simple questions: whether Canipe had anything unlawful in his truck and whether Hagie could look. To the first question, Canipe responded that "he didn't think so," from which a fair inference of uncertainty or hesitation may be drawn. In light of Canipe's lukewarm response and the reliable information Hagie had already acquired, it was reasonable that Hagie request permission to verify. *See Erwin*, 155 F.3d at 820, 822-23 (holding officers were "entitled to ask [] for permission to search" using a similar two-step questioning technique at the conclusion of a traffic stop).

For these reasons, we hold that Investigator Hagie's brief detention and request for consent to search the truck following the initial stop were reasonable and did not transform the legal traffic stop into an unconstitutional seizure.

## B.

Next, Canipe argues that his purported consent to search was invalid. He characterizes his alleged consent as a "mere expression of approval" or "acquiescence" and not the unequivocal, specific, and intelligent consent required to authorize Hagie and Officer Bevins to search his entire vehicle and its contents.

The government bears the burden of demonstrating by a preponderance of the evidence, through "clear and positive testimony," *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999) (citations and internal quotation marks omitted), that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. *Id.*; *see also United States v. Hudson*, 405 F.3d 425, 443 (6th Cir. 2005). Whether these requirements were met "is a question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), and the district court's findings will not be reversed unless clearly erroneous. *United States v. Calhoun*, 49 F.3d 231, 234 (6th Cir. 1995).

Canipe relies upon authority that "mere acquiescence does not suffice to establish free and voluntary consent." *United States v. Moon*, 513 F.3d 527, 538 (6th Cir. 2008) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). In urging us to construe his conduct as acquiescing to Investigator Hagie's demands, he emphasizes Hagie's affirmative responses to defense counsel's questions at the evidentiary hearing asking whether Canipe "acquiesced." Canipe also compares his case to *Worley*, where we interpreted the defendant's statement – "You've got the badge, I guess you can" – in response to law enforcement's request to search a bag containing illegal drugs as "an expression of futility in resistance to authority or acquiesc[ence] in the officers' request." 193 F.3d at 386 (citing *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981) ("[A] search based on consent requires more than mere expression of approval to the search.")). Further, Canipe asserts that the presence of multiple armed officers and his ignorance about his right to refuse consent undermined its voluntariness.

Canipe's contentions lack merit. While defense counsel's use of the word "acquiesced" in his questioning of Investigator Hagie was an attempt to force a fact witness to adopt counsel's legal conclusion, such testimony was both incompetent and unpersuasive. *See* FED. R. EVID. 701 (limiting lay witness opinions and inferences to those based upon the witness's perception and helpful to a clear understanding of his testimony or a *fact* in issue, not based upon technical or other specialized knowledge within the scope of expert testimony); *Torres v. County of Oakland*, 758 F.2d 147, 150

(6th Cir. 1985) ("The problem with [lay witness] testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards . . . . This invade[s] the province of the court to determine the applicable law . . . .") (quotation marks omitted). We agree with the district court's characterization of defense counsel's line of questioning on this issue as "a semantic trap."

Moreover, Canipe's comparison of his case with *Worley* is unpersuasive. Worley testified that when law enforcement asked to search his bag, "[he] didn't feel like [he] could do much of anything," "[he] couldn't just walk away," he did not think that he could just "blow a police officer off," and he could not say "no" to a police officer. *Worley*, 193 F.3d at 383. In addition to this testimony, we deemed it significant that Worley did not make any affirmative statements indicating free and voluntary consent and that the stop was at an airport, an environment which may have pressured Worley into acquiescing to the demands of law enforcement. *Id.* at 387 (citing *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. 1982) (en banc)). Bound by the deferential clear error standard of review, we therefore affirmed the district court's grant of Worley's motion to suppress. *Worley*, 193 F.3d at 387.

Here, as in *Worley*, the clear error standard requires affirming the district court but, unlike in *Worley*, that outcome is unfavorable to Canipe. In determining whether consent was voluntary, the Supreme Court has deemed relevant both the accused's characteristics and the details of the interrogation, including the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226. Contrary to Canipe's contention, the Court has held that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account [in determining whether consent was voluntary], the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.* at 227.

The district court did not clearly err in ruling that Canipe's consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or

coercion.  The duration of the detention and questioning were reasonable.  There was no evidence of coercion.  Canipe never asked to leave.  He responded positively and unambiguously that it "wouldn't be a problem" for Hagie to search his truck.  When Hagie informed Canipe a second time of his intent to search the vehicle, Canipe made no objection.  The district court astutely observed that the "[d]efendant has prior criminal convictions, and therefore he is no stranger to the police or the criminal justice system.  It defies common sense that he meekly 'acquiesced' because he was intimidated by Investigator Hagie."

We agree and find no clear error in the district court's ruling that Canipe's consent was valid.

C.

Finally, Canipe asserts that even if his consent was valid, Investigator Hagie and Officer Bevins unlawfully exceeded its scope.  He complains that he was unable to observe the search and only authorized the officers to "look in" his truck, not to move seats or open containers.

"The district court's determination of whether a search exceeded the scope of consent is a question of fact that we review for clear error."  *United States v. Garrido-Santana*, 360 F.3d 565, 570 (6th Cir. 2004).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The district court did not clearly err in ruling that Canipe's consent to let the officers "[l]ook in" his truck "would be understood by most people to involve a search" of the vehicle, not merely permission to peer through its windows.  *See United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997) (holding that "the use of the term 'look' placed no particular limitations on the scope of the search" and that "a reasonable person would understand that a request by a police officer to 'look' in a bag seeks consent to search the bag for evidence of illegal activity.").  In addition to his initial consent, Canipe

neither objected nor attempted to limit the scope of the search when Hagie informed him a second time (after frisking him) that he was going to "look through" or "go through" the vehicle. Indeed, if "look[ing] in" the vehicle was even colorably ambiguous, looking or going "through" it surely was not.

The evidence also does not support Canipe's contention that he was unable to observe the search. According to Investigator Hagie's testimony, a third officer stood with Canipe between the rear of the truck and the front of Hagie's cruiser – a "short distance" of about ten feet between the two vehicles – while Hagie and Officer Bevins searched the truck.

Additionally, Canipe contends that the officers exceeded the scope of his consent when they opened the two closed containers in his truck which stored the handgun and ammunition. The merits of this argument fall between two genre of cases exemplified by *Jimeno* and *State v. Wells*, 539 So. 2d 464 (Fla. 1989). In *Jimeno*, the Supreme Court held that a suspect's general consent to search a vehicle also authorized police to search closed containers found inside the vehicle, including paper bags. *Jimeno*, 500 U.S. at 250-51. However, prior to obtaining the defendant's consent to search, the officer in *Jimeno* expressly informed defendant that he suspected him of harboring illegal drugs. *Id*. at 251. The Court ruled that a reasonable person would know that narcotics are usually carried in a container and that the defendant's general consent to search for narcotics implicitly authorized the search of containers which might store them. *Id*.

The *Jimeno* Court distinguished *Wells*, in which the Supreme Court of Florida "held that consent to search the trunk of a car did not include authorization to pry open a locked briefcase found inside the trunk." *Jimeno*, 500 U.S. at 251 (discussing *Wells*). The Court commented that "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." *Id*. at 251-52.

While the officers did not convey to Canipe the object of their search (distinguishing this case from the permissible consent search in *Jimeno*), they also did

not break or pry open locked containers (distinguishing this case from the impermissible consent search in *Wells*). Within this area, we have remarked that it is "ordinarily" true that "general consent [to a search] permits the opening of closed but unlocked containers found in the place as to which consent was given" even "where officers did not tell the suspect the object of their search." *Gant*, 112 F.3d at 243 (citing Wayne R. LaFave, SEARCH AND SEIZURE, § 8.1(c) & n.75 (1986) and *United States v. Crain*, 33 F.3d 480 (5th Cir. 1994)). *See also United States v. Fowler*, No. 93-6483, 1994 U.S. App. LEXIS 34525, at *19-*20 (6th Cir. Dec. 7, 1994) (unpublished) ("Although a suspect may limit the area subject to a consensual search, a general consent to search a vehicle includes any compartment or containers within the vehicle.").

In *United States v. Snow*, 44 F.3d 133 (2d Cir. 1995), the Second Circuit aptly explained:

> [U]nder either the King's or the Colonists' English, the term "search" implies something more than a superficial, external examination. It entails "looking through," "rummaging," "probing," "scrutiny," and "examining internally." . . . [A]n individual who consents to a search of his car should reasonably expect that readily-opened, closed containers discovered inside the car will be opened and examined.
>
> That the defendant did not – and probably could not – know what the officer was looking for does not change our view of his consent. It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers. If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.

*Id*. at 135 (rejecting the defendant's argument that officers exceeded the scope of his consent when they searched closed bags in his vehicle without first informing him of the purpose of the search). *See also Crain*, 33 F.3d at 484 (holding that consent to search a car extended to a closed paper bag lodged beneath the driver's seat notwithstanding absence of communication about the object of the search because "[t]his Circuit, relying on *Jimeno*, . . . has held that an individual's consent to an officer's request to 'look inside' his vehicle is equivalent to general consent to search the vehicle and its contents, including containers such as luggage.") (citation omitted).

When Investigator Hagie asked Canipe whether he had anything in his vehicle that might be unlawful or about which he should know, his questioning placed Canipe on notice that any unlawful item would be the subject of his search.  Thereafter, Canipe's general consent to search the vehicle reasonably included permission to search any container that might have held illegal objects.  Significantly, the unlocked box which stored the handgun was inscribed, in plain view, with the name of a familiar firearms manufacturer, thereby rendering its incriminating contents immediately apparent, *see United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (discussing the plain-view doctrine), and further justifying Hagie's decision to open the box.  During the search, Canipe made no attempt to revoke or delimit the scope of his omnibus consent, although he was at or near the scene of the search.  *See Garrido-Santana*, 360 F.3d at 576 (holding that defendant's general consent to search the vehicle encompassed consent to search the vehicle's gas tank where "although defendant had the opportunity to do so, he never objected to the officers' search of the gas tank and, thus, neither clarified that the scope of his sweeping consent excluded such a search nor revoked his consent.").

For these reasons, the district court did not clearly err in ruling that the search was within the scope of Canipe's consent.

## III.

We affirm the district court's denial of Canipe's motion to suppress.[3]

---

[3]Our ruling affirming the district court's denial of Canipe's motion to suppress the firearm and ammunition evidence renders his appeal of the district court's denial of his subsequent incriminating statement as "fruit of the poisonous tree" moot.