**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name:  09a0608n.06**

**Nos. 08-3951, 08-3952**

**FILED**
**Aug 26, 2009**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,                )
                                         )
    Plaintiff-Appellee,              )
                                         )
v.                                       )   ON  APPEAL  FROM  THE  UNITED
                                         )   STATES  DISTRICT  COURT  FOR  THE
JEFFREY WICKERSHAM,                      )   SOUTHERN DISTRICT OF OHIO
                                         )
    Defendant-Appellant.             )

Before:  KEITH, SUTTON and WHITE, Circuit Judges.

SUTTON, Circuit Judge.  Jeffrey Wickersham challenges his drug-trafficking conviction, arguing that the district court should have suppressed cocaine seized from his car as the fruit of an illegal stop and search.  We affirm.

I.

On the evening of January 30, 2007, Trooper Nicholas Johnson of the Ohio State Highway Patrol received a tip about a pending drug sale.  The informant told Johnson that he had seen Wickersham and a woman leave Wickersham's home in Meigs County to buy cocaine in Columbus. He said Wickersham was driving a white Pontiac Grand Prix and gave him some of the characters from the license plate.

Accompanied by his drug-sniffing dog, Snoopy, Trooper Johnson drove to a spot on Route 33 in Athens County where he expected to see Wickersham returning from Columbus. As Wickersham drove by, Johnson was attending to another vehicle, so he told fellow Trooper Michael Jordan "to see if he could get the vehicle stopped." Tr. 74. Jordan caught up with Wickersham and radioed Johnson asking whether there was already probable cause to stop his car. After receiving no answer from Johnson, Jordan told himself, "okay . . . if you're not going to answer me, I'm not going to just stop this car. I'll find a reason to stop it." Tr. 27.

Soon afterwards, Jordan observed Wickersham cross the center line twice, and he activated his lights to stop Wickersham. When Jordan approached the car and asked Wickersham why he had drifted left of center, Wickersham replied that he was "watching" Jordan, because Jordan "had that white Pontiac pulled over" and Wickersham "figured [Jordan was] looking for white Pontiacs." Tr. 9.

Trooper Johnson soon arrived. When he walked Snoopy around Wickersham's car, she sat down in front of the trunk, which indicated that she smelled the odor of drugs. Johnson took Wickersham and a passenger, Elizabeth Saber, out of the car, patted them down, advised them of their *Miranda* rights and locked them in the back of Jordan's cruiser.

Trooper Johnson searched Wickersham's car, and in the trunk he found a flashlight and a locked suitcase he was unable to open. Under the hood, he found a piece of vinyl siding that appeared to form a small compartment behind the battery, which he also was unable to open.

Johnson spoke separately to Saber, who told him that she and Wickersham had been out to dinner, but she could not remember in what restaurant or in which city.

About an hour after the initial stop, a truck arrived to take the car to the nearest patrol station, roughly fifteen minutes away. The troopers drove Wickersham and Saber to the post. Johnson conducted a more thorough search of the car inside the post's lighted and heated garage and eventually discovered about 103 grams of crack cocaine and 14 grams of powder cocaine hidden in the flashlight in Wickersham's trunk. The officers arrested Wickersham, and he was indicted for possession with intent to distribute more than fifty grams of cocaine base. *See* 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii).

Wickersham moved to suppress the cocaine as the fruit of an unlawful stop and search. After hearing the testimony of Troopers Jordan and Johnson and viewing the video footage from their cruisers, the district court denied his motion. Wickersham pleaded guilty to the cocaine charge and to one counting of failing to appear, *see* 18 U.S.C. § 3146(a)(1), but preserved the right to appeal the denial of his suppression motion. He was sentenced to 76 months on the drug offense plus 12 consecutive months for failing to appear.

II.

A.

On appeal, Wickersham first challenges the district court's conclusion that the officer permissibly stopped his car, claiming that the officer did not have probable cause that he had violated the law at the time of the stop. *See United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009). Both sides agree that if Trooper Jordan saw Wickersham swerve left of the lane line without interference or other excuse, then Jordan had probable cause to pull him over. *See id.* That leaves us with a question of fact: Did the district court correctly find that Wickersham crossed the center line before Jordan stopped him? We review this finding for clear error, *id.* at 600, "consider[ing] the evidence in the light most favorable to the government," *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005).

Wickersham claims that he never crossed the lane line and contends that Trooper Jordan made up the story as a pretext for pulling him over. Acknowledging that the state of mind of an arresting officer is not relevant to a Fourth Amendment claim if probable cause otherwise supports the stop, *see Whren v. United States*, 517 U.S. 806, 813 (1996), Wickersham argues that the pretextual nature of the stop nonetheless casts doubt on whether he committed the traffic violation. In support, he notes that Jordan was ordered to stop Wickersham's car, that Jordan admitted he planned to "find a reason to stop" Wickersham, Tr. 27, that Jordan shut off his camera shortly before

seeing the violations, which made it harder to challenge his testimony, and that the odds are slim that, within one minute of pulling up behind Wickersham, Jordan would catch him violating the law.

The key problem with these arguments, however, is that a potential motive to fabricate does not make Trooper Jordan's testimony a fabrication. The district court considered these same points and found Jordan credible, a finding to which we owe "considerable deference," in part because we are not in a position to judge the credibility of Jordan's testimony for ourselves. *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008) (internal quotation marks omitted). Wickersham attempts to cast Jordan's questions about whether he had probable cause and his later remark—"I'm not going to just stop this car. I'll find a reason to stop it," Tr. 27—in a sinister light, suggesting that they show the trooper manufactured a violation. But that is just one way to construe the remarks; it is hardly the only way. It is just as plausible to construe the remarks as demonstrating that Jordan indeed wanted to stop Wickersham but insisted on doing so only after he saw him commit a traffic violation, which is precisely what the Fourth Amendment permits. *See Whren*, 517 U.S. at 813.

No doubt, Jordan would have been well advised to keep his video camera on during the whole pursuit. But he still appeared to comply with the state law rules on point, *see* OSHP Policy OSP-200.06(F)(1), which require activating the camera when an officer "observes an indicator of possible traffic violation," ROA 81, and he did exactly that shortly after observing the left-of-center violations. On this record, we have no basis to infer dishonesty merely from his failure to record the violations.

Finally, the immediacy of the violation—so soon after Jordan pulled up behind Wickersham—says less about the improbability of its occurrence than about how little *Whren* requires before law enforcement officers may make a stop. Nothing in the end establishes that the district court clearly erred in believing Trooper Jordan.

Wickersham argues in the alternative that, even if he did cross the yellow line, he did so only because Trooper Jordan's high-speed approach distracted him. Jordan drove "under heavy acceleration" to catch Wickersham, he explains, then slowed to 55 miles per hour, ending up just two car lengths behind him, Tr. 22, 28–30, making it hard for Wickersham to focus on the road. Wickersham gave Jordan a similar explanation after being pulled over, though at that time he said he was less distracted by Jordan's sudden approach and more distracted by a fear that Jordan was looking to stop white Pontiacs like his.

In either form, this argument is unavailing. The district court considered these same points and found there was "no evidence, only conjecture and supposition from Defendant, that Trooper Jordan's actions caused Defendant to commit the left of center violations." ROA 215. State law requires drivers to follow at a reasonable distance, Ohio Rev. Code § 4511.34(A), and state policy requires the highway patrol to drive within the speed limit in non-emergency situations, OSHP Policy OSP-200.06(B)(3), (C), but neither requirement factors into the federal constitutional inquiry, *see Virginia v. Moore*, 128 S. Ct. 1598, 1604–05 (2008). The evidence might well have *supported* a finding that Jordan caused Wickersham's violation, but it does not *require* such a finding, making it unnecessary to decide how and when an officer-created violation would invalidate a stop. *Cf.*

*Goddard v. Kelley*, No. 70-10705, __ F. Supp. 2d __, 2009 WL 1867862, at *7 (D. Mass. Mar. 31, 2009) (finding arrest unreasonable where officers held someone on private property, then arrested him for trespassing there).

B.

Wickersham next challenges the reasonableness of the troopers' search of his car and its containers. Under the Fourth Amendment, police officers need probable cause to search a car or containers within it. *California v. Acevedo*, 500 U.S. 565, 579–80 (1991). We review the historical facts for plain error and give fresh review to the probable-cause determination. *See Ornelas v. United States*, 517 U.S. 690, 696–97 (1996).

The first question is a factual one: What exactly did Snoopy signal? The district court found, and Wickersham did not challenge below, that, after Snoopy walked around the car, she indicated the presence of a drug odor by sitting down in front of the trunk. On appeal, however, Wickersham suggests that Johnson may have told Snoopy to sit down, or may have primed her to sit in that spot by pushing down her backside before he walked her around the car. The video does not support either theory, *see* Jordan Video 22:36:02–37:20, nor is there any other evidence to support this argument even if it had been preserved below.

Turning to the law: To determine whether a particular set of facts gives rise to probable cause to arrest or search, we look to the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 232 (1983). Generally speaking, "a positive indication by a properly-trained dog is sufficient

to establish probable cause for the presence of a controlled substance." *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008).

Probable cause existed here. No one disputes that Johnson and Snoopy were well trained in their respective roles of dog-handler and drug-sniffer. And Snoopy, as we have shown, indicated the presence of a drug odor when she walked around the car. Adding weight to the probable cause determination is the tip Trooper Johnson received from the confidential informant.

Contrary to Wickersham's contention, the officers' probable cause did not "dissipate" after Trooper Johnson failed to find drugs during the initial search. Granting that at some point an unfruitful search might dissolve probable cause, this is not such a case. Given that it was January, around 11:00 PM, and "very cold [and] windy" outside, Tr. 19, the officers did not act unreasonably in giving up after an hour (much of which was spent talking with Wickersham and Saber rather than searching) and in towing the car to the (warm) station to continue the search there. *See United States v. Ross*, 456 U.S. 798, 825 (1982) (upholding warrantless search of car and its contents that began on the street and was continued at police station); *id.* at 821 n.28 ("The practical considerations that justify a warrantless search of an automobile continue to apply until the entire search of the automobile and its contents has been completed.").

Even if the initial probable cause could have started to wilt at some point, new facts preserved it here. In addition to Snoopy's signal and the informant's tip, Trooper Johnson also discovered the suspicious modifications to the front of the car, and witnessed Saber's suspicious

inability to remember their supposed dinner destination, *see* Johnson Video 23:01:31–06:08, all of which kept the evidence of probable cause fresh. *See United States v. Kincaide*, 145 F.3d 771, 779 (6th Cir. 1998) (secret compartment in vehicle undercarriage supported probable cause); *United States v. Repress*, 9 F.3d 483, 488 (6th Cir. 1993) ("contradictory statements" and "suspicious behavior" supported probable cause).

Our conclusion comports with *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005) and *United States v. Heath*, 259 F.3d 522 (6th Cir. 2001), both of which addressed seizures based on reasonable suspicion, not probable cause. *Davis* found that a long wait was unreasonable after a drug-sniffing dog *failed* to indicate the presence of drug odor and the police spent an hour waiting for another dog. 430 F.3d at 357. In this case, by contrast, Snoopy indicated drug odor on the first pass. Similarly, *Heath* held that the police could not continue to hold someone on reasonable suspicion alone after a search turned up nothing, 259 F.3d at 530–31, but placed no limits on officers who already have probable cause.

Nor is there anything to Wickersham's argument that Snoopy's failure to signal during a second pass around the car shows that probable cause had meaningfully dissipated. Although the parties stipulated at trial that Snoopy alerted during a second trip around the car, the government now concedes that the stipulation turned on a misunderstanding and that the video demonstrates that Snoopy in fact did not alert at the trunk during the second trip around the car, *see* Johnson Video 23:16:57–23:17:15, and may not have alerted at all during that trip. But given the first signal, the

informant's tip, the reconfigured component in the car and Saber's suspicious answers to the

officer's questions, probable cause existed throughout the encounter.

III.

For these reasons, we affirm.