NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0451n.06

No. 22-1511

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Oct 19, 2023

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| TEVIN DUPLESSIS, | ) | MICHIGAN |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: MOORE, READLER, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. This case requires us to consider whether Detroit police had probable cause to search a car based on three 911 calls from two female callers in quick succession. One of the callers gave her name and suggested that her cousin's boyfriend, an African American male, had just "shot at" her cousin and was threatening to return and shoot up their home. This caller stated that the man was driving a black Nissan. She had taken a picture of his Florida license plate and passed along its plate number. While en route to the scene, the police spotted an African American male in a black Nissan with the same plate number. They searched the car and found a gun in the trunk. Tevin Duplessis, the man in the Nissan, pleaded guilty to possessing a firearm as a felon. He now argues that the police lacked probable cause to search the car. We disagree and affirm the district court's denial of his motion to suppress.

I

The sole issue in this case arises from the district court's denial of a motion to suppress evidence. Our summary of the events thus relies on that court's factual findings as supplemented by the evidence presented in the motion-to-suppress proceedings. *See United States v. Brooks*, 987 F.3d 593, 596–97 (6th Cir. 2021); *United States v. Canipe*, 569 F.3d 597, 600 (6th Cir. 2009).

In the wee hours of the morning on April 7, 2020, emergency dispatchers received a series of 911 calls from two women seeking help at an address on Sussex Street in Detroit, Michigan. *See United States v. Duplessis*, 2021 WL 6062346, at *1 (E.D. Mich. Dec. 22, 2021). The first call came in at 2:31 a.m. *Id.* A woman requested police aid at the Sussex Street house and noted that her "best friend's boyfriend had put sugar in" her car's "gas tank." *Id.* (quoting Call, R.61-3, at 0:24–:28). This caller identified herself but stated that she did not know the man's name. *Id.*; Call, R.61-3, at 0:33–:34. She then started to argue with someone in the background, screaming that she has "two kids." Call, R.61-3, at 0:43–:55. The dispatcher ended the call by noting that she had requested the police. *Id.* at 0:56–:59.

The next call came in at 2:38 a.m. *Duplessis*, 2021 WL 6062346, at *1. A different female caller listed the same address and noted that someone had just called 911 about the same issue. *Id.*; Call, R.61-4, at 0:11–:17. When asked what had happened, she said that her "cousin's boyfriend put sugar in her best friend's car, and he's threatening to come back with guns." Call, R.61-4, at 0:28–:36. Moments later, she noted further that this man had "put his hands on [her] cousin and . . . shot at her" about fifteen to twenty minutes ago. *Duplessis*, 2021 WL 6062346, at *1 (quoting Call, R.61-4, at 1:51–:56). He had apparently left the scene but was "threatening to come back and shoot up the house." *Id.* (quoting Call, R.61-4, at 1:25–:28). The caller noted that the events were "happening now," and she "described the suspect as 'a black male' driving 'a

black Nissan.'" *Id.* (quoting Call, R.61-4, at 0:47, 1:08, 1:16–:17). The caller had taken a picture of the Nissan's out-of-state license plate and read the plate number to the dispatcher. *Id.* During much of this call, "screaming could be heard in the background." *Id.*

The last call came in at 2:43 a.m. *Id.* The female from the second conversation called back to note that the man's Nissan had a Florida license plate and to correct the plate number. *Id.*; Call, R.61-5, at 0:41–:45. Although the car had a Florida plate, she described it as a "rental from Michigan." Call, R.61-5, at 0:57–:58. She also noted that the suspect was "on the phone right now, and he's talking about coming back and shooting the house up." *Id.* at 1:12–:19. She then provided her name to the dispatcher. *See Duplessis*, 2021 WL 6062346, at *1.

Two "scout cars" with the Detroit police drove to the scene. *Id.* They spotted a "black Nissan" "occupied by a single black male" "parked on Sussex" just south of the 911 callers' address. *Id.* (quoting Rep., R.61-6, PageID 450). Two officers approached the Nissan. Rep., R.61-6, PageID 450. One spoke with the driver while the other checked the license plate. *Id.* After the officers confirmed that the plate matched the one provided by the 911 caller, they placed the driver, who turned out to be Duplessis, in handcuffs. *Id.*; *Duplessis*, 2021 WL 6062346, at *1. One of the officers then searched the car and found "a loaded 9mm Glock handgun with a spent round in the chamber" and an extended magazine in the trunk. *Duplessis*, 2021 WL 6062346, at *2; Rep., R.61-6, PageID 450.

Sometime during this encounter, Duplessis's sister walked toward the officers and asked for the keys to her Nissan. *Duplessis*, 2021 WL 6062346, at *2 (quoting Rep., R.61-6, PageID 454). The record leaves unclear whether she spoke with them before or after the officers found the gun. *Id.* at *3 n.3. They questioned her about the events. *Id.* at *2. She responded that "nothing happened" and stated that she did not own a gun. *Id.*; Rep., R.61-6, PageID 454.

3

After finding the gun, the officers arrested Duplessis. *Duplessis*, 2021 WL 6062346, at *2. They later found spent shell casings near the Sussex Street address that matched this gun. *Id.* at *2 & n.1.

The government charged Duplessis with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). Duplessis moved to exclude the gun as evidence in his trial, arguing that the police had lacked probable cause to search the Nissan's trunk. The district court disagreed. It held that the 911 calls created probable cause for this search. *Duplessis*, 2021 WL 6062346, at *4.

Once the court denied this motion, Duplessis chose to plead guilty unconditionally without entering into a plea agreement. The court sentenced him to 72 months' imprisonment.

II

Duplessis appeals the district court's denial of his motion to suppress. At the outset, the government argues that Duplessis waived this argument because he entered an unconditional guilty plea and did not preserve his right to appeal the court's suppression order. *See, e.g.*, *United States v. Abdulmutallab*, 739 F.3d 891, 904 (6th Cir. 2014); *United States v. Herrera*, 265 F.3d 349, 351 (6th Cir. 2001). Yet we choose not to decide this "waiver" issue for three reasons. *See United States v. Felix*, 711 F. App'x 259, 261 (6th Cir. 2017). First, Duplessis argues that he did not knowingly waive the right to appeal the issue when he pleaded guilty. Second, Duplessis's appeal raises a straightforward issue under the Fourth Amendment that we find easier to resolve than his involuntary-plea claim.

Third, we do not view this type of "waiver" argument as raising a jurisdictional defect that we must resolve before reaching the merits. *See United States v. Hack*, 999 F.3d 980, 983–84 (6th Cir. 2021); *United States v. Mastromatteo*, 538 F.3d 535, 542–44 (6th Cir. 2008); *cf. United States v. De Vaughn*, 694 F.3d 1141, 1155–58 (10th Cir. 2012); *United States v. Jacobo Castillo*, 496

F.3d 947, 951–57 (9th Cir. 2007) (en banc). Some have suggested that an uncontested, unconditional guilty plea renders a defendant's pre-plea challenges that do not go to the validity of the plea "moot" within the meaning of Article III of the Constitution. *See United States v. Combs*, 657 F.3d 565, 569–71 (7th Cir. 2011) (per curiam). But a case becomes moot only when a court can grant the party who wins no "effectual" remedy. *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295 (2023) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). If we agreed with Duplessis here, we could grant him his requested relief: overturning the criminal judgment, suppressing the gun, and remanding for further proceedings. Although Duplessis's failure to enter a conditional plea may bar us from doing so, that conclusion would go to the merits of the government's "waiver" claim. *Cf. id.* at 296.

We thus proceed to the legal merits—but on Duplessis's constitutional claim rather than the government's waiver claim. The Fourth Amendment's protection against "unreasonable searches" generally requires the police to obtain a warrant before they intrude on the private spaces of private individuals. U.S. Const. amend. IV; *see Riley v. California*, 573 U.S. 373, 382 (2014). Yet, ever since a Prohibition-era decision, the Supreme Court has excluded automobile searches from this general warrant requirement. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam); *Carroll v. United States*, 267 U.S. 132, 151–53 (1925). As long as the police have the "probable cause" that they would need to obtain the warrant, they may search an automobile without one. *See Dyson*, 527 U.S. at 467; *Brooks*, 987 F.3d at 599.

Because the police did not obtain a warrant here, then, this case turns on whether the police had probable cause to search Duplessis's Nissan. The Court has recognized that the test for probable cause does not set "a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation omitted). Police officers must possess enough information to create a "probability or

5

substantial chance" that they will find evidence of a crime in the location that they seek to search. *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). And we evaluate whether they have met this test from the perspective of an ordinary "prudent" person, not a lawyer. *Id.* at 231 (citation omitted). Apart from these general standards, though, the Court has refused to offer a more "precise definition" and has instead held that whether a given set of facts rises to the probable-cause level depends on the "totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Police often learn of a suspect's crimes from third parties like 911 callers. The Court has recognized that "many different types of persons" can provide these "tips," which "come in many shapes and sizes[.]" *Gates*, 462 U.S. at 232; *United States v. Baker*, 976 F.3d 636, 649 (6th Cir. 2020). To assess whether this type of information may be useful in determining probable cause, the Court has found two questions "highly relevant[.]" *Gates*, 462 U.S. at 230; *United States v. Pasquarille*, 20 F.3d 682, 687 (6th Cir. 1994). A court should consider whether an informant is "sufficiently trustworthy" by considering the informant's "veracity." *United States v. Bell*, 2022 WL 59619, at *2 (6th Cir. Jan. 6, 2022). The court should also consider how an informant has learned of the information by considering the informant's "basis of knowledge." *Id.* But the Court has added that the police need not meet both factors in every case and that substantial evidence on one of the factors can overcome a "deficiency" in the other. *Gates*, 462 U.S. at 233.

Applying these standards here, the district court found that probable cause existed. We would generally review its factual findings for clear error and its legal conclusions de novo. *See Canipe*, 569 F.3d at 600. But Duplessis does not dispute any of the factual findings. So we must ask only whether the undisputed information created probable cause to search the Nissan. We review that mixed question of law and fact de novo. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996). And we agree with the district court.

6

Start by considering whether the 911 callers' information, if true, would have created a "substantial chance" that the officers would find evidence of a crime (a gun) in the Nissan. *Gates*, 462 U.S. at 243 n.13. Our answer: Yes. The calls revealed that an African American man driving a Nissan with a specific Florida license plate had "shot at" his girlfriend within the last twenty minutes and was "threatening to come back and shoot up the house." Call, R.61-4, at 1:25–:28, 1:51–:56. If accurate, these facts suggest that the man may have just committed a felonious assault and might commit another in the near future. *See* Mich. Comp. Laws § 750.82(1). The police also found the Nissan with the identical Florida plate close to the callers' address. Because the callers seemingly conveyed events as they happened, a "prudent" person who knew this information could believe—indeed, would likely believe—that the suspect might have the gun in this car. *Gates*, 462 U.S. at 231 (citation omitted).

Probable cause in this case thus rests on whether the 911 callers were "sufficiently reliable" to allow the officers to credit their information. *Navarette v. California*, 572 U.S. 393, 398 (2014). They were. First consider their "veracity." *Gates*, 462 U.S. at 238. Courts have repeatedly recognized that known informants have greater credibility than anonymous tipsters because the government can hold them accountable for filing false information. *See United States v. Bryant*, 2022 WL 1008837, at *3 (6th Cir. Apr. 4, 2022) (citing cases); *cf. Florida v. J.L.*, 529 U.S. 266, 270 (2000). And the two 911 callers in this case gave their names and addresses. *Duplessis*, 2021 WL 6062346, at *1. Michigan also makes it a crime to intentionally provide false information to 911 emergency dispatchers. *See* Mich. Comp. Laws § 750.411a(1). So the two callers resemble the "honest citizen" whose credibility does not require much in the way of corroboration. *Gates*, 462 U.S. at 233; *see United States v. Woods*, 858 F. App'x 868, 870 (6th Cir. 2021).

Next, consider their "basis of knowledge." *Gates*, 462 U.S. at 238. Courts give more weight to "detailed statements" showing "firsthand knowledge" than to conclusory allegations. *Bell*, 2022 WL 59619, at *2; *see Pasquarille*, 20 F.3d at 688. And here, the second caller provided details about how she got the information about the suspect. During her first call to police (the second call from the house), she noted that she had used her phone to take a picture of his Nissan's license plate. Call, R.61-4, at 1:34–:35. She can be heard struggling to talk on her phone while simultaneously looking at the picture to convey the plate number. *Id.* at 2:26–3:24. During her second call (the third call from the house), she corrected the license plate number and added that it was from Florida. Call, R.61-5, at 0:41–:45. Her ability "to describe in detail the type of the vehicle, the state from which the license plate was issued, and [all] of the characters contained on the license plate" bolstered her credibility. *Pasquarille*, 20 F.3d at 688.

The callers also left no doubt that the dangerous events were happening in real time. As the Court has recognized when deciding whether reasonable suspicion exists, the fact that the callers conveyed "contemporaneous" information also bolstered their credibility. *Navarette*, 572 U.S. at 399. After noting that the suspect had put sugar in her car's gas tank, the first caller can be heard engaged in a loud argument with others—suggesting that the incident was ongoing. The second caller expressly stated that the events were "happening now" and that the suspect had initially discharged his firearm a mere fifteen to twenty minutes ago. *Duplessis*, 2021 WL 6062346, at *1. During the third call, she explained that the suspect was "on the phone *right now*, and he's talking about coming back and shooting the house up." Call, R.61-5, at 1:12–:19 (emphasis added).

8

Lastly, substantial "corroboration" existed. *Gates*, 462 U.S. at 241. For one thing, the two callers corroborated each other because both called from the same address and both mentioned that the suspect had put sugar in a gas tank. For another thing, the police corroborated the second caller's information by checking the license plate of the Nissan that they observed near the Sussex Street address before the search. *Cf. Draper v. United States*, 358 U.S. 307, 313 (1959).

Duplessis's responses do not change things. He suggests that "simply being in the vicinity where criminal activity occurred and matching a description may not be enough" to establish probable cause. Appellant's Br. 11. We do not disagree because probable cause depends on the "totality of the circumstances." *Pringle*, 540 U.S. at 371. Whether probable cause exists will depend on many additional questions. For example, how precise was the "description" of the suspect? And how close in time to the crime did a person give the description? Here, the totality of the circumstances would have permitted a "prudent" person to believe that the Nissan's driver was the specific suspect that the 911 callers implicated. *Gates*, 462 U.S. at 231 (citation omitted).

In that respect, Duplessis overlooks critical information when he notes that plenty of African American men drive black Nissans in Detroit. Appellant's Br. 13. This description ignores the most important detail: the second caller provided the Nissan's specific plate number and the police confirmed that the Nissan had the same number. Given that each car on the road has its own unique plate number, Duplessis likely *was* "the only individual in the city who fit" the caller's description when we consider all (not just some) of her information. *Id.*

Duplessis lastly questions the second caller's reliability. *Id.* at 14. She told the dispatcher that the suspect was on the phone when she called 911 a second time, but the police did not note whether Duplessis was talking with anyone when they approached him. And the caller did not mention that the suspect had anybody else with him in the car, but Duplessis's sister approached

the police during the encounter. These minor details do nothing to undermine the caller's credibility. A "prudent" officer could believe that Duplessis had simply ended the call by the time that they got there. *Gates*, 462 U.S. at 231 (citation omitted). And because they were so close to the Sussex Street address, Duplessis's sister could have simply walked to the scene.

We affirm.