RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 19-2283

*v.*

DEMETRIUS BROOKS,

*Defendant-Appellant.*

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cr-20671-1—Paul D. Borman, District Judge.

Decided and Filed:  February 9, 2021

Before:  GUY, LARSEN, and MURPHY, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:**  Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Detroit, Michigan, for Appellant.  Douglas C. Salzenstein, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────

**OPINION**

─────────────

MURPHY, Circuit Judge.  After police officers pulled over the vehicle in which Demetrius Brooks had been riding, they smelled marijuana and saw him making a "stuffing motion" under his seat.  The police found a gun partially hidden there.  After a jury convicted Brooks of being a felon in possession of a firearm, the lone African-American juror emailed the court that the other jurors had pressured her into a guilty verdict.  Brooks now claims that the stop and search of the vehicle violated the Fourth Amendment, that the prosecution presented

insufficient evidence that he "possessed" a gun, and that he is entitled to an evidentiary hearing under *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), to investigate the racial biases of the other jurors. These claims require us to consider among other questions: Did the number of officers who conducted the traffic stop affect whether it was "reasonable" under the Fourth Amendment? Does the felon-in-possession statute require a defendant to control a gun for any significant period of time? And does *Peña-Rodriguez* permit an evidentiary hearing to impeach a jury verdict even when no jurors made race-based statements? Answering "no" to these questions, we affirm Brooks's conviction.

I

Because the district court denied Brooks's motion to suppress and the jury convicted him, we recount the facts in the light most favorable to the prosecution. *See United States v. Maya*, 966 F.3d 493, 496 (6th Cir. 2020); *United States v. Canipe*, 569 F.3d 597, 600 (6th Cir. 2009).

Late at night on August 4, 2018, three Detroit police officers (Lenin Amarante, Joseph Anthony, and Jaime Rodriguez) stopped at a red light next to a Jeep Compass. Alexsand Pina was driving the Jeep; Angel Torres was in its front passenger's seat; Brooks sat behind Torres in the backseat. While waiting for the light to turn green, Officers Amarante and Anthony both observed that Torres was not wearing his seatbelt. The officers decided to pull the Jeep over for this civil infraction. They stopped it at a vacant gas station.

As Officer Anthony approached the Jeep's passenger side, he smelled marijuana emanating from the vehicle. Anthony also saw Brooks in the backseat leaning forward with his shoulders parallel to his knees "making a stuffing motion under the seat." Believing that Brooks was trying to conceal contraband (and potentially a firearm), Anthony asked Brooks what he had stuck under the seat. Anthony also alerted his fellow officers to Brooks's conduct because, as he explained, the conduct raised "an officer safety issue." After Brooks denied hiding anything, Anthony opened the car door and ordered him out of the vehicle.

In the meantime, Officer Amarante had approached the driver, Pina. Pina told Amarante that he had a permit to carry a firearm and that it was located in the driver-side door. Amarante also noticed the smell of marijuana as he spoke with Pina, but Pina denied allowing anyone to

smoke in the car. Amarante realized at that point that Brooks had been in the backseat and saw what appeared to be a "marijuana cigar" in Brooks's left ear. Amarante also heard Officer Anthony convey to Brooks something like: "My man, let me see your hands." Amarante secured Pina's gun and ordered him out of the Jeep so that they could look for marijuana.

Officer Rodriguez searched the Jeep while the other two officers conversed with the three occupants outside the vehicle. When searching the Jeep's rear passenger side where Brooks had made his stuffing motion, Rodriguez saw the handle of a firearm protruding out between the seat and floorboard. The handgun had been loaded and its serial number scratched off. Rodriguez immediately turned around from the rear passenger-side door and showed the other officers the gun. The officers also recovered suspected marijuana, a suspected marijuana cigarette, and $723 from Brooks.

The government charged Brooks with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the gun on the ground that the officers had violated the Fourth Amendment. The district court disagreed. It credited the officers' testimony that Torres had not been wearing his seatbelt, which gave them probable cause to stop the Jeep. It next credited the officers' testimony that they smelled marijuana and noticed Brooks make a "stuffing motion," which gave them probable cause to search the Jeep.

The jury found Brooks guilty of the felon-in-possession count. Hours after the verdict, the jury's sole African-American juror sent the district court an email. The juror indicated that she felt pressured to return a verdict against Brooks and that the other jurors had sided with the police:

> I feel morally responsible to myself, the court, and to the defendant[] to let you all know that during deliberations I was pressured by other members of the jury to select a guilty verdict when that is not what I believe to be true. I believe that the[re] was reasonable doubt and more evidence was need[ed] to actually find the defendant guilty. I was told by the members that I was not using common sense and was berated every time I brought up the lack of evidence. During selection we were asked if we would be able to apply the same scrutiny to the testimony of the witnesses because they were officers and everyone answered yes. However, immediately in deliberations the other jurors sided with the police even though they all agreed that the[re] was enough lack of evidence to cause a reasonable doubt. . . . But they said they are leaning more towards guilty because the cops

say he is guilty.  I am fine with whatever consequence happens to me because I allowed myself to be peer press[ur]ed into a guilty verdict.

Brooks suggested that the other jurors may have been racially biased and requested an evidentiary hearing and a new trial under *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). The court denied the motion because there was no evidence that the jurors had made race-based comments against Brooks or this juror.  It sentenced Brooks to 66 months' imprisonment.

II

Brooks challenges the district court's rulings on: (1) his motion to suppress evidence; (2) his motion for judgment of acquittal on sufficiency-of-the-evidence grounds; and (3) his motion for an evidentiary hearing and new trial based on the juror's post-verdict email.

A

Seeking to suppress the firearm, Brooks argues that the officers violated the Fourth Amendment when they discovered it in the Jeep.  The Fourth Amendment provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  Brooks characterizes the officers' initial stop of the Jeep as an "unreasonable" "seizure" and their later inspection of the Jeep as an "unreasonable search."  We consider the officers' actions in that order.

*Initial Stop*.  The stop of a vehicle qualifies as the "seizure" of a "person" that must be "reasonable" under the Fourth Amendment.  *See Whren v. United States*, 517 U.S. 806, 809–10 (1996).  Yet reasonableness in this context does not require a warrant.  "[P]ractically since the beginning of the Government," officers have been allowed to stop a vehicle on public roads without a warrant when they have probable cause to believe that the occupants have committed a crime.  *Carroll v. United States*, 267 U.S. 132, 153–56 (1925).  Our cases also permit vehicle stops based on a mere "reasonable suspicion" that a felony has occurred or that a misdemeanor is occurring, analogizing these temporary stops to the well-known "*Terry* stop" from *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016); *see also Arizona v. Johnson*, 555 U.S. 323, 330–31 (2009).  But our cases leave unclear whether we

continue to require probable cause for a stop if officers believe that an occupant has committed only a *civil* traffic offense. *See United States v. Shelton*, 817 F. App'x 217, 219 & n.2 (6th Cir. 2020); *United States v. Taylor*, 471 F. App'x 499, 510–11 (6th Cir. 2012). This lingering uncertainty does not matter in this case because we have also held that an officer has probable cause if the officer sees an individual in the vehicle not wearing a seatbelt in violation of state law. *See United States v. Tillman*, 543 F. App'x 557, 560 (6th Cir. 2013); *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010); *United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009); *United States v. Draper*, 22 F. App'x 413, 414–15 (6th Cir. 2001) (per curiam).

These rules doom Brooks's challenge to the initial stop of the Jeep. Michigan law requires most individuals in the front seat of a vehicle to wear a seatbelt, and it makes the failure to do so a civil infraction. Mich. Comp. Laws § 257.710e(3), (9). Officers Amarante and Anthony both personally observed the Jeep's front passenger (Torres) not wearing a seatbelt when their cruiser pulled up next to it. The district court credited their testimony. And the officers' observation that Torres was likely committing a civil seatbelt infraction gave them probable cause to stop the vehicle under the Fourth Amendment. *See Street*, 614 F.3d at 232.

Brooks counters with a factual point and a legal one. Factually, Brooks cites evidence cutting against the officers' claim. The driver, Pina, testified that Torres likely had been wearing his seatbelt the whole time because the Jeep had not been making the "annoying" sound that rings when seatbelts are unfastened. The officers' body cams also showed that Torres had managed to fasten his seatbelt by the time they pulled over the Jeep. But this factual debate was for the district court to resolve. And the officers' unequivocal testimony supported its factual finding that they saw Torres without a seatbelt on. This finding thus cannot be described as clearly erroneous. *See Canipe*, 569 F.3d at 603–04.

Legally, Brooks says that the officers' seatbelt "excuse" did not permit the stop because it was "pretextual" and the officers were really engaged in a fishing expedition to uncover crime in a high-crime area. He misunderstands black-letter law. Under the Fourth Amendment, officers may stop a car as long as they objectively have probable cause that an occupant of the car has committed a traffic offense, even if they subjectively do so for a different reason. *Whren*, 517 U.S. at 811–16. "*Whren* puts an end to inquiries" like Brooks's "about an officer's state of

mind in conducting a traffic stop." *Street*, 614 F.3d at 232. And while the Equal Protection Clause does bar officers from pretextually stopping a car based on such unlawful motivations as the occupants' race, Brooks asserts no equal-protection claim here. *See Tillman*, 543 F. App'x at 560.

*Vehicle Search.* The rummaging through of a vehicle stopped on a road qualifies as the "search" of a person's "effects" that also must be "reasonable" under the Fourth Amendment. *See Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018). Here again, however, reasonableness does not require a warrant. Given the transitory nature of vehicles, the Supreme Court has long held that the police may conduct a warrantless search as long as they have probable cause to believe that the vehicle contains evidence of a crime. *See California v. Acevedo*, 500 U.S. 565, 569 (1991); *Carroll*, 267 U.S. at 153–56. And our court has long held that officers have the required probable cause when they detect the odor of illegal marijuana coming from the vehicle. *See United States v. Sheron*, 787 F. App'x 332, 332 (6th Cir. 2019); *United States v. McKinley*, 735 F. App'x 871, 873 (6th Cir. 2018); *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013); *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008); *United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993).

These rules doom Brooks's alternative challenge to the officers' search of the Jeep. Officer Amarante testified that he ordered the search of the Jeep because he smelled marijuana emanating from it and saw what appeared to be a "marijuana cigar" behind Brooks's ear. Officer Anthony likewise testified that the marijuana smell was so strong that he could detect it as he first approached the Jeep. And the officers did not need to rely on the smell of narcotics alone: Anthony also observed Brooks stuffing something under a seat—what was, in his experience, a sure sign of an attempt to hide contraband. The district court again credited the officers' testimony. Given our caselaw holding that the smell of marijuana by itself can create probable cause of illegal activity, *Johnson*, 707 F.3d at 658, the officers in this case had probable cause because they did not even need to rely on that odor alone.

Brooks responds with a broad challenge to the entire encounter. He argues that the officers' strong show of force qualified as excessive "over policing." According to Brooks, a total of three officers rushed the Jeep, slammed opened the doors, and immediately forced everyone out—all for a mere seatbelt infraction. His argument raises questions on which little caselaw exists: When can the "show of force" used to execute an otherwise reasonable traffic stop make it unreasonable under the Fourth Amendment? *Cf. United States v. Johnson*, 874 F.3d 571, 574–75 (7th Cir. 2017) (en banc). And should the exclusionary rule even apply to this type of claim, given that the police presumably would have uncovered the same evidence if they had acted in a more measured manner? *Cf. Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

We need not resolve these questions, however, because Brooks's factual allegations do not stand up against the district court's findings (or the video evidence). The officers' body cams and their cruiser's dash cam show them only walking toward the Jeep. And the officers did not open the car doors and order the occupants out until after they smelled marijuana and saw Brooks hide something under his seat. The officers thus did not remove the occupants for a "mere" seatbelt infraction; they removed them because they had probable cause to conduct a search and to believe that Brooks had hidden a dangerous weapon. If anything, this case shows the potential dangers posed by these types of encounters and proves why the Supreme Court has adopted a seemingly bright-line rule allowing officers to order individuals out of a lawfully stopped vehicle. *See Johnson*, 555 U.S. at 330–31; *Street*, 614 F.3d at 232.

That leaves only Brooks's complaint that three officers—not just one—confronted the Jeep's occupants after the stop. Admittedly, some caselaw indicates that the number of officers might assist in showing the dividing line between a *consensual* encounter and a *coercive* seizure. *See, e.g.*, *United States v. Peters*, 194 F.3d 692, 697 (6th Cir. 1999) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J., opinion)). But everyone agrees that a seizure occurred here. Brooks instead claims that the presence of three officers made that seizure unreasonable even though they had probable cause to effect it. Yet "[t]he number of officers is not independently a 'seizure' of any kind." *McNair v. Coffey*, 279 F.3d 463, 466 (7th Cir. 2002). And Brooks cites no case suggesting that the Fourth Amendment restricts the number of officers who may implement a valid seizure supported by probable cause. *See id.* To the contrary, we

have plenty of cases upholding traffic stops undertaken by multiple officers with nary a suggestion that the number of officers mattered to the seizure's reasonableness. *See, e.g.*, *United States v. Ware*, 465 F. App'x 487, 489, 493–95 (6th Cir. 2012); *United States v. Herbin*, 343 F.3d 807, 808–10 (6th Cir. 2003); *Garza*, 10 F.3d at 1244–46. That is not surprising, given the Supreme Court's repeated admonition about "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *Johnson*, 555 U.S. at 330. Nothing that occurred during the encounter in this case violated the Fourth Amendment.

B

Brooks next argues that the government presented insufficient evidence that he possessed a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). Although we review this claim de novo, Brooks still must satisfy a demanding standard: He must convince us that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020) (citation omitted).

The felon-in-possession statute makes it "unlawful for any person" "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition[.]" 18 U.S.C. § 922(g). This text requires proof of three elements: (1) a "status element" (that Brooks "had a prior felony conviction" and knew of his felon status); (2) a "possession element" (that Brooks "knowingly possessed a firearm"); and (3) a "jurisdictional element" (that "the firearm traveled in or affected interstate commerce"). *United States v. Conley*, 802 F. App'x 919, 922 (6th Cir. 2020); *see Rehaif v. United States*, 139 S. Ct. 2191, 2194 (2019). Brooks stipulated at trial that the government proved the status and jurisdictional elements. He disputes only whether he knowingly "possessed" a firearm. But we must reject his sufficiency-of-the-evidence claim because a rational jury could conclude that he did.

Possession under § 922(g) can be either "actual" (when, for example, individuals keep guns on their person) or "constructive" (when, for example, individuals coordinate with others to keep guns in their home without handling them). *See United States v. Garcia*, 758 F.3d 714,

718–21 (6th Cir. 2014); *United States v. Craven*, 478 F.2d 1329, 1333–34 (6th Cir. 1973) (abrogated on other grounds). This case involves actual possession. A person actually possesses a gun (in contrast to, say, owning it) when the person has "actual and physical control" over the gun. *Black's Law Dictionary* 1046 (5th ed. 1979); *see also Webster's Third New Int'l Dictionary* 1770 (1966); *United States v. Morrison*, 594 F.3d 543, 545 (6th Cir. 2010). And nothing in the word "possess" requires a defendant to *retain* control of the gun for any lengthy period of time. Rather, the knowing control of a gun "at a given time" is enough to violate the statute, *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (citation omitted), which contains no "minimum temporal prerequisite" for the prohibited possession, *United States v. Pratt*, 704 F. App'x 420, 425 (6th Cir. 2017); *see also United States v. Vereen*, 920 F.3d 1300, 1308 (11th Cir. 2019); *United States v. Johnson*, 459 F.3d 990, 996 (9th Cir. 2006).

The government often must rely on circumstantial evidence to prove this actual possession. Two of our cases show the type of evidence that suffices. First consider *Morrison*. There, an officer discovered a firearm between the driver's seat and the center console of the car that the defendant had been driving. 594 F.3d at 544. The firearm had been "'less than inches' away from" the defendant and may have been rubbing against his side as he drove. *Id.* We analogized the gun's location to one "in a holster" and held that it was close enough to the defendant to support an inference that he knowingly kept it under his immediate control. *Id.* at 545. Or consider *Garcia*. There, the defendant scaled a fence and tumbled over the other side while fleeing police on a cold night. 758 F.3d at 717. As the defendant got back up, an officer saw him drop unknown objects into the snow. *Id.* The officer found a firearm partially buried in the snow at this precise spot. *Id.* The gun was covered with droplets of water, suggesting that it had not been there for long because the water had not frozen. *Id.* We held that this evidence sufficed for a rational jury to conclude that the defendant had knowingly controlled the gun. *Id.* at 718–21.

This case fits the mold of these others. Officer Anthony observed Brooks make a "stuffing motion" under his rear passenger-side seat in the Jeep. Anthony's body-cam footage supports this testimony: It shows a seated Brooks initially with his hands underneath him and then raising his hands up in the air. And Officer Anthony immediately tells the other officers

that Brooks "just stuck something." Officer Rodriguez next explained that he searched the specific area where Brooks had stuffed something: "the rear passenger seat in between like the floorboard and the seat." And Rodriguez observed "the handle of a firearm sticking out" between the seat and floorboard. The cruiser's dash-cam footage confirms this testimony: It shows Rodriguez lean into the Jeep's rear passenger-side door and emerge holding up a firearm. From this evidence, a rational jury could determine that Brooks had physical control over the gun and attempted to stuff it under his seat as the officers approached. *See Morrison*, 594 F.3d at 545. That factual finding would suffice to prove that Brooks knowingly had "actual possession" (physical control) within the meaning of § 922(g). *See id.*; *see also United States v. Montague*, 438 F. App'x 478, 480–81 (6th Cir. 2011). Although we do not know for how long Brooks controlled the gun, he did not need to control it for any "minimum" period of time. *Pratt*, 704 F. App'x at 425. Even if Torres had handed the gun to Brooks, for example, the time it took for him to grab the gun and conceal it under his seat would suffice. *See id.*

In response, Brooks emphasizes the rule that "mere proximity" to a gun cannot alone prove possession. We typically apply this rule in constructive-possession cases, not actual-possession cases like this one. *See Morrison*, 594 F.3d at 545. Regardless, a rational jury could have found more than simply that Brooks was "close" to the gun. The jury could have found that he actually controlled the gun as he was stuffing it under his seat.

This fact distinguishes the case on which Brooks relies—*United States v. Birmley*, 529 F.2d 103 (6th Cir. 1976). There, the police discovered guns in the trunk of a vehicle in which the three defendants were traveling. *Id.* at 105. We found sufficient evidence that the driver had possessed the guns because he had made calls about them; we also found sufficient evidence against the front passenger because he possessed the trunk key. *Id.* at 107. But we held that insufficient evidence existed for the third defendant because the record showed only his "[m]ere presence on the scene plus association with illegal possessors[.]" *Id.* Here, by contrast, the jury could have concluded that Brooks actually controlled the gun and did not simply ride in the car in which it was found.

Brooks counters that there was no "direct" evidence that he controlled the gun, such as testimony from the officers that they saw him holding it. But the government may (and often

must) rely on circumstantial evidence in these cases. *See Garcia*, 758 F.3d at 718. There is nothing unusual about that. *Maya*, 966 F.3d at 500. As we have held, "circumstantial evidence alone can defeat a sufficiency challenge." *Id.* (citation omitted). This case well illustrates the point. A first officer saw Brooks stuffing something under his seat. A second officer recovered a gun (and nothing else) from that precise location. This is powerful evidence that he possessed the gun. What else was he stuffing under his seat? Brooks offers no explanation. So sufficient evidence of actual possession existed.

C

Brooks ends by challenging the district court's refusal to hold an evidentiary hearing or grant a new trial based on the African-American juror's post-verdict note that she felt pressured by the other jurors to return a guilty verdict. We review the district court's decision to deny Brooks's motion for an abuse of discretion. *See United States v. Ewing*, 749 F. App'x 317, 321 (6th Cir. 2018); *United States v. Robinson*, 872 F.3d 760, 770–72 (6th Cir. 2017); *see also United States v. Norwood*, 982 F.3d 1032, 1055–57 (7th Cir. 2020); *United States v. Birchette*, 908 F.3d 50, 55 (4th Cir. 2018). And we see no error.

For centuries, courts have been reluctant to peek behind a jury verdict and inquire into the jury's deliberations or a juror's subjective understandings. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017) (discussing *Vaise v. Delaval*, 99 Eng. Rep. 944 (K.B. 1785)). This traditional "no-impeachment rule" provides "substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Id.* at 861. The rule has now been codified in Federal Rule of Evidence 606(b). This evidentiary rule generally bars a juror from giving evidence "about any statement made or incident that occurred during the jury's deliberations," about "the effect of anything on that juror's or another juror's vote," or about "any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). It includes only narrow exceptions for evidence about "extraneous prejudicial information," an improper "outside influence," or a "mistake" in "entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

Apart from these three rule-based exceptions, the Supreme Court in *Peña-Rodriguez* added a fourth constitutionally rooted exception. After the verdict in that case, two jurors alleged that another juror had made several biased remarks that the defendant was guilty of sexual misconduct because of his ethnicity. *See* 137 S. Ct. at 862. To give one example, this juror allegedly said: "I think he did it because he's Mexican and Mexican men take whatever they want." *Id.* The state courts found this evidence inadmissible under Colorado's no-impeachment rule. *Id.* The Supreme Court reversed, holding that the Sixth Amendment requires courts to set aside their no-impeachment rules and consider evidence of racial bias when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant[.]" *Id.* at 869. It reasoned that, unlike other types of juror misconduct, "racial bias implicates unique historical, constitutional, and institutional concerns." *Id.* at 868. To protect the general interests served by the no-impeachment rule, however, the Court clarified the narrow scope of its holding. The holding did not cover "every offhand comment indicating racial bias or hostility"; rather, it required a showing that a juror made a statement "exhibiting overt racial bias" and "tend[ing] to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 869. The Court also clarified that local court rules could continue to "shape[] and guide[]" the way in which lawyers could acquire and present this evidence. *Id.*

In this case, Brooks makes no attempt to fit the juror's emailed note into any of the narrow rule-based exceptions to the no-impeachment rule in Rule 606(b)(1). The juror did not make claims about "extraneous" or "outside" influences. Fed. R. Evid. 606(b)(2). Nor did the juror allege a mistake in the verdict. *Id.* To the contrary, Rule 606(b)(1)'s general prohibition squarely covers the juror's statement. She alleged that the other jurors "pressured" and "berated" her to reach a guilty verdict and that they sided with the police despite what she perceived to be a lack of evidence. The juror's email addresses "statement[s] made . . . during the jury's deliberations" (the other jurors' statements pressuring this juror), the "effect" of those statements on her "vote" (the statements caused her to vote to convict), and all of the jurors' "mental processes" (the other jurors allegedly placed too much weight on the words of the police and this juror voted to convict because of their pressure). Fed. R. Evid. 606(b)(1). So Rule 606(b)(1)

makes clear that the district court could "not receive" the "juror's statement on these matters." *Id.*

Brooks thus attempts to fit the juror's email within *Peña-Rodriguez*'s constitutionally required exception on the ground that the juror who sent it was African American. This attempt has two problems. For one thing, the juror's email did not even mention race, let alone suggest that other jurors made race-based remarks. Yet, as the Seventh Circuit noted when rejecting a nearly identical claim, *Peña-Rodriguez* "requires a clear statement of overt racial bias." *Norwood*, 982 F.3d at 1057; *see also United States v. Baker*, 899 F.3d 123, 134 (2d Cir. 2018). For another thing, the juror's email indicates that the other jurors were critical of the *juror* (and her purported failure to rely on common sense), not of *Brooks*. Yet, as we noted in a case in which a juror made derogatory remarks about other jurors, the challenged statement must suggest not just that a juror harbored racial bias, but also that this racial bias played a significant role "*in the juror's vote to convict*" the defendant. *Robinson*, 872 F.3d at 770 (quoting *Peña-Rodriguez*, 137 S. Ct. at 869); *see also Birchette*, 908 F.3d at 59. And here, the juror was complaining about the other jurors' alleged undue reliance on the police when voting to convict Brooks—not about their reliance on any racial bias when voting to convict him.

Brooks argues that the other jurors' race-neutral comments might nevertheless show evidence of their implicit bias against African Americans. But if the race-neutral statements alleged in this case were enough to trigger *Peña-Rodriguez*'s exception and allow evidentiary hearings compelling jurors to articulate the subjective motivations behind their neutral statements, this purportedly "rare" exception would eventually swallow the rule. 137 S. Ct. at 871. After all, it has not been uncommon for jurors to assert after the fact that other jurors pressured them into their verdict. *See, e.g.*, *Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008); *United States v. Lloyd*, 462 F.3d 510, 518–19 (6th Cir. 2006); *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir. 1989); *United States v. Blackburn*, 446 F.2d 1089, 1090–91 (5th Cir. 1971). As one court noted, that type of allegation "can suggest the normal dynamic of jury deliberations, with the intense pressure often required to reach a unanimous decision." *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990). Or, as another said, "total placidity is not the nature of jury deliberation." *United States v. Tallman*, 952 F.2d 164, 167 (8th Cir. 1991).

We instead take *Peña-Rodriguez* at its word: to require *express* statements of racial animus, not *neutral* statements that may suggest unexpressed racial biases.

Brooks lastly relies on an encounter with another juror whose social-media posts suggested he might harbor racial animus. But this encounter undermines Brooks's claim that *Peña-Rodriguez* imposes broad inroads into the no-impeachment rule. Once the posts were brought to the district court's attention before trial, the court questioned the juror and excused him for cause. This pretrial incident confirms that courts have other tools at their disposal to "protect against the scourge of racially motivated verdicts without discarding the no-impeachment rule." *Birchette*, 908 F.3d at 57.

We affirm.