NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0513n.06

Case No. 21-1611

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**FILED**

Dec 09, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| JEFFREY ALLEN KAISER, | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: READLER, MURPHY, and MATHIS, Circuit Judges.

MURPHY, Circuit Judge. Six people saw Jeffrey Kaiser brandish a black semiautomatic pistol. After officers arrested him at his suspected home, they found a revolver and ammunition in the home and a black pistol stashed underneath a car parked behind it. At Kaiser's trial for being a felon in possession of the pistol, revolver, and ammunition, another witness testified that she had traded the revolver to Kaiser for drugs at a time when she was addicted to heroin. A jury convicted Kaiser on all counts. He now argues that the district court should have given our pattern "addict-informant" instruction because of this witness's prior addiction. He also argues that the evidence did not permit a rational jury to find that he possessed the firearms and ammunition. Yet the district court properly declined to give our pattern jury instruction because the witness had overcome her addiction well before Kaiser's trial. And plenty of evidence connected Kaiser to the weapons and ammunition. We thus affirm.

I

All agree that Kaiser at one point lived at a specific home on Rowe Street in Ludington, Michigan. Several neighbors identified Kaiser as a resident of this Rowe Street home. Ludington police officers likewise had prior encounters with him there. But Kaiser indicated that his wife had kicked him out of the home a few months before the critical day in this case: August 13, 2020.

On that day, Kaiser visited the apartment of Lance and Jennifer Peebles to attempt to collect a debt that Lance owed him. Lance and Jennifer were both home, as was an acquaintance, Jeff Young. Kaiser and Lance got into a heated debate over the money. Three of those involved have offered differing accounts about what happened next. According to Jennifer Peebles, she told Kaiser to get out of her apartment. Kaiser responded by displaying a black handgun that resembled a firearm "a police officer might carry[.]" Tr., R.85, PageID 577–79. Peebles asserted that Kaiser pointed this pistol at her and threatened to shoot her and Lance. Kaiser left without firing a shot, but not before punching Lance in the face. According to Kaiser, by contrast, he asked for money and punched Lance only after Lance shoved him. Kaiser also claimed that he held his phone (not a gun) during this altercation. Young likewise indicated that he "never seen no gun" and that Kaiser appeared to have his "black cell phone in his hand[.]" *Id.*, PageID 770.

Where did Kaiser go next? He testified: "I start[ed] to home, or I start[ed]—I went to go check on my wife" at the Rowe Street residence. *Id.*, PageID 780. As Kaiser biked to this location, Richard Spinner drove by him in what Kaiser thought was a dangerous manner. Spinner was traveling with his cousin, Bruce Stafford, to a home near where Kaiser was headed. By the time Spinner and Stafford got out of the car, an expletive-shouting Kaiser approached. The three began to argue. Kaiser soon pointed a black semiautomatic pistol at Spinner and said: "Do you want to die today?" *Id.*, PageID 595. Spinner called 911. Both Stafford and Jeffrey Orr (Spinner's

2

downstairs neighbor) witnessed this encounter and saw the pistol. Another couple working nearby in their backyard, Darryl and Lana Powell, also overheard the argument and saw Kaiser with the pistol. According to Spinner, Kaiser ended the confrontation by tucking the pistol into a "black bandana" and walking across the street toward the Rowe Street home. *Id.*, PageID 597.

As it turns out, Jennifer Peebles had already called 911. After questioning Lance and Jennifer Peebles at the police station, officers obtained a warrant to search the Rowe Street home based on their belief that Kaiser lived there. The Ludington police department's equivalent of a "SWAT team" executed the warrant in light of the risks that Kaiser posed. *Id.*, PageID 662, 704. As this team attempted to clear the house, an officer posted outside spotted Kaiser attempting to exit through the backdoor. This officer commanded Kaiser to put his hands up, but Kaiser retreated inside.

After officers arrested Kaiser and secured the home, they searched it for the black pistol. They instead discovered a .357 Magnum caliber revolver inside a cabinet near the backdoor where Kaiser had exited. Jessica Curtin's late father was the registered owner of this revolver. Curtin indicated that she had been a drug addict years in the past and had stolen the revolver from her father and given it to Kaiser in exchange for drugs. During the search, the officers also found ammunition hidden throughout the house. Near some of the ammunition located in a bedroom, they discovered pieces of mail and prescription bottles with Kaiser's name on them.

Because the police had failed to unearth the black semiautomatic pistol, another officer returned to the scene the next day to speak to neighbors and retrace Kaiser's steps. The Powells told this officer where they had seen Kaiser walking after his confrontation with Spinner. As the officer searched the identified area, he found a black Hi-Point .9mm semiautomatic pistol wrapped in a black bandana underneath a vehicle in the backyard of the Rowe Street home.

3

Over the next week, Kaiser made several calls to his wife from jail. In the first call, he told his wife to "go by [her] car" and check "underneath" to "make sure" that his "tools" were there. Trial Ex. 25. A few days later, she asked him about the "black gun" that the police had found "under" her car around the same time that he had told her to check for his tools. Trial Ex. 26. Kaiser retorted: "So what, they were listening to the phone conversation and fuckin' went there at the same time?" *Id.* In another call, Kaiser berated his wife for telling the police that he would "hang out" at the "back of the house" where the revolver was found. Trial Ex. 28. He exclaimed "that didn't happen" and asked her: "You didn't tell them anything like that, did you?" *Id.* When she answered that she thought she made such a statement to one of the officers, he responded: "I just said you didn't say that to anybody, are you dense or what?" *Id.*

A grand jury indicted Kaiser on three counts of being a felon in possession of a firearm or ammunition in violation of 18 U.S.C. § 922(g)(1). Count 1 charged him with possessing the revolver found inside the Rowe Street home. Count 2 charged him with possessing the pistol found in its backyard. Count 3 charged him with possessing the ammunition found at this residence.

Kaiser stood trial. The parties stipulated to most of the elements for these three felon-in-possession offenses. They agreed that Kaiser had at least one prior felony conviction, he knew he was a felon, and the firearms and ammunition were manufactured outside Michigan. The dispute at trial thus turned on whether Kaiser knowingly possessed the pistol, revolver, and ammunition.

Testifying for the prosecution, Jennifer Peebles, Spinner, Stafford, Orr, and the Powells noted that they saw Kaiser with a black handgun and opined that the recovered pistol looked similar to the gun that he possessed. Jessica Curtin also recounted her revolver-for-heroin trade with Kaiser. And several officers testified about the events and their ensuing investigation of Kaiser.

4

The government lastly introduced Kaiser's jail calls with his wife and photographs of the recovered firearms and items found during the search of the Rowe Street home.

Testifying for the defense, Kaiser stated that he never possessed the black pistol and theorized that Lance Peebles might have planted it underneath his wife's car. He also stated that his wife had bought the revolver years ago and that he had not seen it since. He lastly claimed that he had no knowledge of the ammunition in the Rowe Street home, which he claimed not to have lived in on August 13. In addition, Young indicated that he had not seen Kaiser with a gun at the Peebles' apartment.

The jury convicted Kaiser on all counts. The district court sentenced him to 228 months' imprisonment.

## II

Kaiser seeks to vacate his convictions for two reasons. He argues that the district court wrongly denied a requested jury instruction. And he argues that the government failed to present enough evidence to support any of his three convictions. We reject both theories.

### A. Jury Instruction

Kaiser challenges the district court's refusal to give a jury instruction about Jessica Curtin's testimony. Because no eyewitness observed Kaiser with the revolver found in the back of the Rowe Street home, Curtin's testimony that she gave Kaiser the revolver in exchange for drugs played a significant role in proving that he knowingly possessed this gun. Curtin admitted that she suffered from a heroin addiction when this trade occurred. She also testified that she believed the government would not charge her for "trading the gun or having drugs" because of her testimony. Tr., R.85, PageID 735–36. Given Curtin's drug addiction and this statement, Kaiser requested that

the district court give our pattern "addict-informant" jury instruction. This instruction provides in

relevant part:

> (1) You have heard the testimony of [the relevant witness]. You have also heard that he was using [certain drugs] during the time that he testified about, and that the government has promised him that he will not be prosecuted . . . in exchange for his testimony.
>
> (2) It is permissible for the government to make such a promise. But you should consider [this witness]'s testimony with more caution than the testimony of other witnesses. An addict may have a constant need for drugs, and for money to buy drugs, and may also have a greater fear of imprisonment because his supply of drugs may be cut off. Think about these things and consider whether his testimony may have been influenced by the government's promise.

Sixth Circuit Pattern Jury Instruction 7.06B. The district court denied Kaiser's request but agreed

to give a similar instruction for government informants.

We review the court's refusal to give this addict-informant instruction for an abuse of

discretion. *See United States v. Smith*, 624 F. App'x 385, 391 (6th Cir. 2015). When a district

court has declined to give a requested instruction, we typically consider three questions to decide

whether its refusal amounted to an abuse of discretion. Did the requested instruction correctly

state the law? Did other instructions substantially cover the content of the requested instruction?

And did the lack of the instruction substantially impair the party's theory of the case? *See United

States v. Godofsky*, 943 F.3d 1011, 1019 (6th Cir. 2019); *Scott v. Mitchell*, 209 F.3d 854, 883 (6th

Cir. 2000); *United States v. Anderson*, 1998 WL 833701, at *4 (6th Cir. Nov. 20, 1998).

The answers to these questions show that the district court did not abuse its discretion here.

To begin with, our pattern instruction is a poor fit for the "circumstances" of this case. *United

States v. Combs*, 369 F.3d 925, 939 (6th Cir. 2004) (quoting *United States v. Brown*, 946 F.2d

1191, 1195 (6th Cir. 1991)). Its language would have suggested to the jury that Curtin had a unique

incentive to lie (over and above the incentive of the ordinary informant) because of her "constant

need for" heroin and her fear that "imprisonment" would prevent her from obtaining it. Sixth Circuit Pattern Jury Instruction 7.06B(2). But that sort of suggestion would have been false. Curtin testified that she had been "clean" for two years by the time of trial. Tr., R.85, PageID 729, 731. At no point has Kaiser ever disputed this assertion. So it would have been wrong for the district court to imply that Curtin's testimony might have been influenced by any "abnormal fear of going to prison and losing access" to her heroin supply. *United States v. Mendez*, 97 F. App'x 583, 585 (6th Cir. 2004) (order), *vacated on other grounds*, 543 U.S. 1104 (2005); *see Scott*, 209 F.3d at 882–83; *United States v. Austin*, 215 F.3d 750, 752 (7th Cir. 2000) (Easterbrook, J.).

This conclusion comports with a large body of our precedent. We have repeatedly upheld a refusal to give the addict-informant instruction when the relevant witness was no longer addicted to drugs by the time that the witness cooperated with the government. *See Smith*, 624 F. App'x at 391; *Mendez*, 97 F. App'x at 585; *Scott*, 209 F.3d at 882–83; *United States v. Rich*, 2000 WL 92269, at *5 (6th Cir. Jan. 19, 2000) (per curiam); *United States v. Freeman*, 1991 WL 203088, at *3 (6th Cir. Oct. 4, 1991); *cf. United States v. Taylor*, 9 F. App'x 465, 469 (6th Cir. 2001).

And to the extent Kaiser feared that Curtin had an incentive to lie because of her hoped-for immunity, the district court gave another instruction that "substantially covered" this concern. *Scott*, 209 F.3d at 882–83; *cf. Combs*, 369 F.3d at 939–40; *United States v. McGhee*, 882 F.2d 1095, 1100 (6th Cir. 1989). After indicating that the jury had heard that "the government has promised [Curtin] that she will not be prosecuted in exchange for her cooperation," the court told the jury that it "should consider [her] testimony with more caution than the testimony of other witnesses." Tr., R.86, PageID 858. It noted further that the jury should "[c]onsider whether her testimony may have been influenced by the government's promise" and that it should not convict

Kaiser based on Curtin's "unsupported testimony" "alone" unless it believed her "beyond a reasonable doubt." *Id.*, PageID 858–59; *see* Sixth Circuit Pattern Jury Instruction 7.07.

Kaiser responds that, apart from probing a witness's bias, our pattern addict-informant instruction serves a second purpose: to alert jurors that addicted informants (more than regular informants) might lack the "ability to recall the details" of events that occurred when they were suffering from addiction. Appellant's Br. 21; *cf. United States v. Hessling*, 845 F.2d 617, 621 (6th Cir. 1988). The problem? Nothing in our pattern instruction identifies this memory concern as the *reason* why the jury should give an addicted informant's testimony greater scrutiny. If Kaiser thought the court should bring this concern to the jury's attention, he should have proposed language to that effect and shown the necessity, under the circumstances, of a special instruction. Even if Kaiser had proffered a memory-specific instruction, moreover, he has offered no evidence to show the accuracy of his basic "proposition" that those who are suffering from addiction have worse memories than those who are not. *Austin*, 215 F.3d at 752. The parties' briefs are "unenlightening" on this empirical question. *Id.*; *cf. Hessling*, 845 F.2d at 620–21.

In all events, the district court gave another instruction that "substantially covered" Kaiser's second concern too: our general pattern instruction on the credibility of witnesses. *Scott*, 209 F.3d at 882–83. The court told the jury that it must "decide how credible or believable each witness was." Tr., R.86, PageID 848. It further explained that the jury must decide "how much weight" a witness's testimony "deserves," considering questions like: "Did the witness seem able to accurately remember what happened?" And did anything exist that "may have interfered with the witness's ability to perceive or remember events"? *Id.*; Sixth Circuit Pattern Jury Instruction 1.07. The jury thus knew that it should consider Curtin's memory as a basis to judge her credibility.

8

Lastly, the lack of an addict-informant instruction did not "substantially impair" any part of Kaiser's defense. *Scott*, 209 F.3d at 883. Was he able to show that Curtin had an incentive to lie or that her addiction may have affected her memory? Yes, the court imposed no restrictions on Kaiser's ability to cross-examine her about these things. Curtin also readily admitted to her "wild" lifestyle during the time that she was addicted to heroin, even conceding that she did not "remember a whole lot" about her exchange of the gun for drugs with Kaiser. Tr., R.85, PageID 727–28. She likewise admitted on cross-examination that she believed that she would not get in trouble if she testified. When combined with the instructions that the judge gave, Kaiser had all that he needed to attempt to convince the jury not to believe Curtin.

## B. Sufficiency of the Evidence

Kaiser alternatively argues that the government did not present sufficient evidence for his three felon-in-possession convictions. His argument faces an uphill battle because of the "demanding legal standard" that applies even when a defendant preserves a sufficiency challenge. *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020) (quoting *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019)). We may consider only whether the record contains enough evidence for "*any* rational trier of fact" to have found the crime's "essential elements" "beyond a reasonable doubt." *Id.* (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)). When undertaking this inquiry, moreover, we may not reweigh the evidence or make our own assessments about the relative trustworthiness of the various witnesses. *See id.* at 499.

Yet Kaiser's sufficiency challenge here must surmount an even higher bar because he failed to properly preserve it in the district court. Under Federal Rule of Criminal Procedure 29, Kaiser should have moved for a judgment of acquittal at the end of the government's case and renewed it at the close of the evidence. *See United States v. Hamm*, 952 F.3d 728, 739–40 (6th Cir. 2020).

After the government rested, however, Kaiser sought an acquittal only on the narrow ground that the government failed to establish proper venue. His reliance on this specific argument forfeited all others, including those that he raises now. *See id.* at 740. Besides, he also did not renew this narrow motion at the close of evidence. *Cf. United States v. Dotson*, 2022 WL 6973397, at *9 (6th Cir. Oct. 12, 2022). Under our caselaw, then, Kaiser must show that the record is so "devoid of evidence" that a "manifest miscarriage of justice" would ensue from a decision to uphold his convictions. *Id.* (quoting *United States v. Woods*, 14 F.4th 544, 555 (6th Cir. 2021)).

To decide whether a rational jury could find a crime's "essential elements," we must, of course, identify those elements. *Potter*, 927 F.3d at 453 (citation omitted). The parties here have made that requirement easy because they dispute only one of the felon-in-possession elements: whether Kaiser knowingly possessed the pistol, revolver, and ammunition. *See United States v. Brooks*, 987 F.3d 593, 601 (6th Cir. 2021). The government may prove this element by establishing either that Kaiser *actually* possessed the pistol, revolver, and ammunition or that he *constructively* did so. *See id.*; *see also, e.g.*, *United States v. Raymore*, 965 F.3d 475, 483–84 (6th Cir. 2020). Actual possession requires evidence that Kaiser had "actual and physical control" over the firearms and ammunition. *Brooks*, 987 F.3d at 601 (quoting *Black's Law Dictionary* 1046 (5th ed. 1979)). Constructive possession requires evidence that Kaiser had both the "power" and the "intention" to "exercise dominion and control over" these items, "either directly or through others." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008) (quoting *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007)).

For all three counts, we cannot describe the record as "devoid of evidence" that Kaiser possessed the firearms or ammunition. *Raymore*, 965 F.3d at 484 (citation omitted). *First*—the pistol. A rational jury could have concluded that Kaiser had actual possession (that is, "actual and

physical control") of this firearm. *Brooks*, 987 F.3d at 601 (citation omitted). No fewer than six eyewitnesses testified that Kaiser brandished a black semiautomatic pistol that closely resembled the recovered pistol introduced at trial. Spinner, one of those many witnesses, added that Kaiser hid the pistol in a "black bandana" when he walked away from their confrontation. Tr., R.85, PageID 597. An officer later found the pistol wrapped in a black bandana in the general area in which Kaiser had headed. Later, Kaiser told his wife to check on his "tools" (what a rational juror could conclude was not-so-subtle code language) underneath the car where the pistol was found. Trial Ex. 25. This amount of evidence is more accurately described as "overwhelming" than "insufficient."

*Second*—the revolver. A rational jury could have found that Kaiser had constructive possession (that is, the power and intent to exercise control) of the revolver on August 13, 2020. *Campbell*, 549 F.3d at 374–75. As an initial matter, significant evidence showed that he had complete access to the Rowe Street home. *See, e.g.*, *United States v. Rich*, 2021 WL 4144059, at *29 (6th Cir. Sept. 13, 2021); *United States v. Workman*, 755 F. App'x 533, 537–38 (6th Cir. 2018); *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010). Many witnesses testified that he lived there, and he was seen leaving out the backdoor near where the police found the revolver. While several other people also resided at this home, only "a modicum of additional evidence" was needed to tie Kaiser to the revolver. *United States v. Latimer*, 16 F.4th 222, 227 (6th Cir. 2021). Curtin's testimony showed that he had actually possessed this revolver in the past when he traded drugs for it. Kaiser also later attempted to cajole his wife to change her prior statement that he would "hang out" in the home's backroom where the police found the revolver. Trial Ex. 28.

*Third*—the ammunition. A rational jury could have found that Kaiser had constructive possession of the ammunition found around the Rowe Street house. *See Campbell*, 549 F.3d at

374. Again, the jury could find that he resided at this home. *See Workman*, 755 F. App'x at 537–38; *Jenkins*, 593 F.3d at 484. And again, the jury could find additional evidence connecting him to the ammunition. *Latimer*, 16 F.4th at 227. Much of the ammunition matched the revolver or pistol that the jury could have concluded Kaiser possessed. And much of it was found in a bedroom that the jury could have concluded he occupied. *Cf. id.* at 226; *United States v. Craven*, 478 F.2d 1329, 1333–34 (6th Cir. 1973). It was found near the pieces of mail and prescription bottles that had his name on them. When Kaiser testified, moreover, he conceded that he was wearing the same shoes that were visible in a picture of the bedroom from the time of the search. (Kaiser claimed that these shoes actually belonged to someone else who lived there, but a rational jury was free to disbelieve him.)

In response, Kaiser initially suggests that our demanding miscarriage-of-justice standard of review conflicts with the ordinary plain-error test that many other circuit courts apply to forfeited sufficiency-of-the-evidence challenges. *See United States v. Burris*, 999 F.3d 973, 978 (6th Cir. 2021). He asks us to switch to that plain-error framework. But we cannot overrule our published precedent. *See id.* And Kaiser's sufficiency challenge would fail under the usual plain-error test anyway. *See id.*

Kaiser next argues that the government presented insufficient evidence to show that he lived at the Rowe Street residence on the date in question. Yet several witnesses tied him to this location. He was also physically present at the home on the date of his arrest, as were items with his name on them. Even during his own testimony, Kaiser repeatedly referred to the Rowe Street residence and the area around it as "my house" and "my alley" before attempting to correct himself by saying "my wife's house" or "my wife's alley." Tr., R.85, PageID 784, 795. It thus did not

12

take a large logical leap for the jury to conclude that he was still predominantly living at this location.  *See Workman*, 755 F. App'x at 537–38.

We affirm.