NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0382n.06

No. 24-1089

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 31, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| JAMES RUSSELL KING, II, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: CLAY, READLER, and DAVIS, Circuit Judges.

CLAY, Circuit Judge. Defendant James King appeals the district court's denial of his motion to suppress evidence obtained as the result of a traffic stop on September 17, 2022. During the stop, a drug-sniffing dog positively alerted to King's vehicle, and a subsequent search revealed 10.5 grams of methamphetamine as well as used needles that contained crystal methamphetamine residue. King was indicted for (1) conspiring to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846; and (2) possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 18 U.S.C. § 2. Following the district court's denial of King's motion to suppress, he pleaded guilty to the second charge of possession of methamphetamine with intent to distribute, but reserved his right to appeal the denial of the motion to suppress. On appeal, King argues that the district court erred in denying his motion because officers unreasonably prolonged the traffic stop beyond its initial mission without reasonable suspicion of drug activity. Because we

conclude that King's seizure was not unreasonably prolonged, we **AFFIRM** the district court's denial of the motion to suppress.

## I. BACKGROUND

The traffic stop that is the subject of King's motion to suppress occurred on September 17, 2022. Prior to that date, King was the subject of a drug trafficking investigation conducted by Cole Hodge, a Michigan State Police ("MSP") trooper assigned to a Drug Enforcement Administration ("DEA") task force. In May 2022, Hodge received tips from a "potential informant" facing criminal charges that King was trafficking large amounts of methamphetamine from downstate Michigan to locales in the Upper Peninsula. Supp. Hr'g Tr., R. 119, Page ID #644–45. Hodge followed up on these initial tips by contacting King's parole officer, who provided Hodge with King's contact information and the make and model of a pickup truck that King purchased. The parole officer also provided information about King's movements that corresponded to the tips Hodge received—King frequently traveled downstate to visit his children, and he seasonally worked on Mackinac Island, where he was suspected of distributing methamphetamine.

Hodge continued to investigate King in June and July of 2022, and eventually obtained a search warrant for King's historical and active cell phone location data. From surveilling King's phone data, Hodge was able to track King's location, and discerned that he was returning to the Upper Peninsula from a trip downstate on July 29, 2022. MSP troopers surveilled King as he reentered the Upper Peninsula, and observed King's attempt to evade surveillance and veer into a separate roadway. The troopers relocated King and stopped him based on an alleged lane violation. During the stop, a drug-sniffing dog alerted to King's vehicle. Troopers found only methamphetamine residue, which was attributed to King's passenger and eventual fiancée Marissa Rosebush.

A warrant was subsequently issued for Rosebush's arrest. No methamphetamine was found on King's person or attributed to King.

After the July 2022 stop, Hodge continued to surveil King and monitored his license plate. On September 15, 2022, two days prior to the relevant stop in this appeal, Hodge learned that King had traveled downstate. On September 17, 2022, he learned that King was returning to the Upper Peninsula. Suspecting that King was on a narcotics run, Hodge instructed uniformed MSP troopers to attempt a traffic stop. He informed troopers that (1) King was currently on parole; (2) King was bringing methamphetamine from downstate to the Upper Peninsula; (3) King was stopped on July 29, 2022, and had attempted to evade troopers' initial attempts at a stop; (4) it was possible that Rosebush was also in the vehicle; and (5) Rosebush had a felony warrant for possession of methamphetamine. Hodge also relayed that King's vehicle was pulling an empty utility trailer.

Troopers surveilled King as he returned to the Upper Peninsula. MSP trooper Colin Immel clocked King's speed on a radar device and observed that King was traveling at 71 miles-per-hour, six miles over the posted speed limit of 65 miles-per-hour. As Immel pursued King for speeding, he observed additional traffic infractions—King's trailer had no working brake lights, and one brake light on King's vehicle was out. Immel pulled King over for the traffic infractions and made contact with King on the driver's side of the vehicle. While King was still in his vehicle, Immel obtained King's license and registration, and asked King to remove two knives he had on his person. King initially tried to hand Immel his driver's license through the driver's side window, only rolling the window partially down. This odd interaction piqued Immel's suspicion that King was under the influence of drugs. As Immel continued to interact with King, he observed additional possible symptoms of intoxication, including that King was nervous, sweating, experiencing mood swings, and was "very challenging." *Id.* at Page ID #669–70.

3

Upon contact with King, Immel identified Rosebush sitting in the front passenger seat of King's vehicle. Immel's partner, trooper Ethan Metras, obtained Rosebush's identification and verified her information. Metras believed that Rosebush was under the influence of drugs, or that she was extremely nervous—she was trembling, sweating but also complaining of being cold, and appeared sensitive to sunlight.

After Immel received King's license and registration, he asked King to join him in the front seat of his patrol car, a request Immel "routinely" makes during traffic stops. *Id.* at Page ID #661–62. King agreed to sit in the vehicle. Immel informed him that he was free to leave at any time. As King sat in the patrol car, Immel verified King's identity, registration, and insurance, and checked his driver's license against law enforcement databases for outstanding warrants or involvement in additional drug investigations. None of these routine checks gave Immel additional reason to detain King.

As Immel ran these checks, he questioned King about his travels. King stated that he was traveling from Mount Pleasant, in downstate Michigan, to Manistique in the Upper Peninsula. King said he visited one of his children and looked at a lawn mower for sale that he ultimately declined to buy. Immel believed King's responses to be suspicious because King did not know the type of lawn mower he was attempting to buy—he knew only that it was a rider lawn mower—and King said that he declined to buy the lawn mower after the seller changed the agreed-upon price. Immel later testified that, in his experience, "when you are going to go and purchase something, especially several hours away, you are going to know a price" for the item. *Id.* at Page ID #665.

While Immel was asking King about his travel plans, another MSP vehicle arrived on the scene, approximately three minutes and fifty-seven seconds into the stop. It was a marked K-9 vehicle

driven by MSP trooper Kyle Lott, and contained his drug-sniffing dog, Rudy. Rudy is trained and certified in the detection of methamphetamine, crack cocaine, powder cocaine, and heroin. Lott and Rudy had previously responded to King's vehicle during the July 29, 2022 stop, when Rudy indicated positive for the presence of drugs and Rosebush was found with methamphetamine residue.

King observed the K-9 vehicle as it approached, and said "You got another guy coming too? Some dogs next? You guys go ahead. I don't have shit." Exhibit 3, 3:57–4:03. Immel interpreted King's statements as permission to do a free-air sniff around his vehicle. When Lott got out of his vehicle, Immel gave him a nonverbal signal to conduct the free-air sniff. Lott then went back to his vehicle, released Rudy, and allowed the dog to relieve himself before proceeding with the free-air sniff.

After King's interjection, Immel continued to conduct routine database checks in his patrol vehicle, and additionally questioned King about his possession of illegal substances. King generally denied possessing illegal substances, and denied possessing marijuana, cocaine, and heroin. But when Immel twice asked King if he had methamphetamine in his vehicle, King gave no verbal response. Immel observed King's "chest . . . rise and fall heavier than normal" when he was asked about methamphetamine. Supp. Hr'g Tr., R. 119, Page ID #667.

After this questioning, at around six minutes and eighteen seconds into the stop, Immel asked King to exit the patrol car. At this time, Immel had verified King's basic information and completed his database searches, but still had to complete other tasks Immel qualified as routine and incident to the traffic stop: running King's trailer registration plate and performing a field sobriety test. Immel also had yet to issue King a citation for traffic violations, and ultimately declined to do so.

5

Seven minutes and five seconds into the stop, Metras confirmed there was an active warrant for Rosebush's arrest on drug-related charges. After confirming the warrant, Metras arrested Rosebush and checked her waistband for contraband, but found nothing. Metras radioed for a female trooper to do a more thorough search of Rosebush's person incident to the arrest.

Seven minutes and thirteen seconds into the stop, Immel obtained King's consent to search his person, and subsequently conducted the search. Immel found no weapons, drugs, or drug paraphernalia on King's person. He found $1,500 in cash in King's wallet, which King stated was for the purchase of the lawn mower.

During the consent search, Lott notified Immel that Rudy positively indicated for the odor of narcotics on King's vehicle. Lott began the free air sniff at around seven minutes into the stop. He observed Rudy head-snapping, bracketing, excessively wagging his tail, breathing deeply, and ultimately giving a "finalized response for the odor of narcotics" by sitting by the driver's side of King's vehicle near the doors. *Id.* at Page ID #710–11. The positive alert occurred between eight minutes and eight minutes and fifteen seconds into the stop.

After completing the consent search of King's person, Immel and Metras searched King's vehicle pursuant to Rudy's positive alert. Immel recovered 10.5 grams of a substance he suspected to be methamphetamine from a locked bag on the passenger side of the vehicle. Metras recovered two used hypodermic needles from the headliner above the driver's seat, within reach of the driver. Metras observed that the needles were used, and had a residual substance on them. Lott field-tested the residue on the needles, and the residue field-tested as positive for methamphetamine.

As a result of the evidence obtained during the search of the vehicle, King was arrested for possession of methamphetamine, maintaining a drug vehicle, and parole violation.

Officers recovered an additional 1.3 kilograms of methamphetamine at King's mother's home, in black bags King referenced in a monitored jail phone call.

King was subsequently indicted by a federal grand jury on two charges: (1) conspiracy to distribute and possess with intent to distribute 5 or more grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846 (Count 1); and (2) possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 18 U.S.C. § 2. He filed a motion to suppress all evidence obtained as a result of the September 17, 2022, traffic stop, arguing that his detention during the stop was unreasonably prolonged, and therefore that the searches of his person and vehicle violated his Fourth Amendment rights. After a hearing on August 22, 2023, the district court denied the motion in an oral ruling. The court concluded that before the drug dog alerted to the presence of narcotics, none of the troopers' actions exceeded the scope of the traffic stop. It was reasonable for the officers to take eight or nine minutes to work through a traffic stop and a parolee search. But even if the traffic stop was extended beyond its initial mission during this time, the troopers had sufficient reasonable suspicion to support the extension. And once the dog alerted, the officers were free to search every nook and cranny of King's vehicle.

After his motion was denied, King pleaded guilty to Count 2 of the superseding indictment against him, possession with intent to distribute 5 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), b(1)(B). In his plea agreement, King reserved the right to seek review of the district court's denial of his motion to suppress. The district court accepted King's plea and sentenced King to 140 months' imprisonment and five years' supervised release.

## II. DISCUSSION

## A. Standard of Review

When reviewing a district court's denial of a motion to suppress, we review findings of fact for clear error, and conclusions of law *de novo*. *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *Id.* (alteration in original) (internal quotation marks omitted).

## B. Analysis

King argues only that his detention was unreasonably prolonged beyond the time necessary to handle the alleged traffic violations for which he was stopped. But he does not dispute that the drug dog's positive alert gave the troopers probable cause to search his vehicle. And he does not dispute the dog's reliability. Thus, it is clear that the certified drug dog's alert provided probable cause for the search of King's vehicle. *See Florida v. Harris*, 568 U.S. 237, 246–47 (2013) (dictating that, absent conflicting evidence of unreliability, "a court can presume" that a certified drug dog's positive alert "provides probable cause to search"). He instead contends that prior to the dog's alert, officers unreasonably extended the time "reasonably required to complete the process of issuing a ticket for a traffic violation" in order to facilitate the dog sniff. Appellant's Br., ECF No. 22, at 14. Therefore, we examine the stop for the approximately eight minutes prior to the dog's positive alert. We conclude that the stop was not unreasonably prolonged, and that King's Fourth Amendment rights were not violated.

As an initial matter, King does not contest that he was stopped for a lawful reason—driving over the speed limit and with the brake lights out on his vehicle and trailer.[1]  But though King's initial seizure was "concededly lawful," "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  The scope of an ordinary traffic stop is limited "to address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citation omitted).  The scope of the stop therefore includes "determining whether to issue a traffic ticket," and "ordinary inquiries incident to [the traffic] stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (alteration in original) (internal quotation marks omitted).  "[T]he Fourth Amendment tolerate[s] certain unrelated investigations" during a traffic stop, but "only so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Id.* at 354–55 (third alteration in original) (internal quotation marks omitted).  Thus, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. . . .  But  . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355.  "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354.

---

[1] Nevertheless, King attempts to argue that because troopers had an ulterior motive for the stop—investigation of drug trafficking—they needed reasonable suspicion that he was trafficking drugs to affect the traffic stop on September 17, 2022.  Undoubtedly, the stop was pretextual.  "It is well established, however, that police officers may stop a vehicle that commits a traffic violation and look for evidence of a crime, even if the traffic stop is merely a pretext and they do not have an independent reasonable suspicion of criminal activity." *Hernandez v. Boles*, 949 F.3d 251, 258 (6th Cir. 2020).  Where King was legally stopped for a traffic violation, troopers did not need further justification for the initial stop, regardless of their motives.

King argues that several intrusions exceeded the mission of the initial seizure—the lawful traffic stop—and unreasonably prolonged his detention, violating the Fourth Amendment and ending authority for his seizure. We proceed chronologically with the first relevant alleged intrusion. Shortly after he was pulled over, King agreed, upon Immel's request, to sit in the front seat of Immel's patrol car while Immel ran routine checks on his license and registration. Situating King in the patrol car added about 40 seconds to the stop. King argues that this request was not "normal" for a traffic stop, and unreasonably prolonged the duration of the stop. Appellant's Br., ECF No. 22, at 15–17. We disagree. We have previously ruled that officers may permissibly detain defendants in their patrol cars during traffic stops without reasonable suspicion. *See United States v. Hill*, 195 F.3d 258, 269–270 (6th Cir. 1999) (ruling that a traffic stop that included an officer's heeded request that a driver sit in the officer's patrol car was not unreasonably prolonged). Such detentions do not exceed the scope of a traffic stop if the officer's actions were reasonably tailored to the mission of the stop and were not otherwise unreasonable. *See id.*

Under the circumstances of this case, Immel's request that King sit in his patrol car was reasonable and did not prolong the traffic stop. "Reasonableness . . . depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (internal quotation marks omitted). In establishing that an officer's order that a driver exit his vehicle during a lawful traffic stop affects only a *de minimis* intrusion on the driver's liberty, the Supreme Court has recognized that considerations of officer safety fall within the public interest and affect our assessment of reasonableness. *Id.* at 110. Specifically, officers may face a higher risk of assault from "approach[ing] a person seated in an automobile." *Id.* If officers stand on the side of the road

while interacting with drivers, they also face "[t]he hazard of accidental injury from passing traffic." *Id.* at 111.

In light of these concerns, Immel's request that King sit in his patrol car was reasonable. Immel's request was motivated by the same officer safety concerns that guided the Court in *Mimms*—Immel testified that speaking to King in his patrol car negated the necessity of him repeatedly exiting his vehicle, into traffic, to obtain additional information from King. And the request did not exceed the scope of the traffic stop. Immel testified that he put King in his patrol car, in part, to more efficiently facilitate his questioning related to the stop. While King was in the patrol car, Immel proceeded with tasks related to the stop, conducting routine checks of King's information. Thus, King's placement in the patrol car was within the bounds of the initial stop, and did not prolong it. *Cf. United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996) (finding that an officer lawfully detained a defendant in his patrol car after the initial stop while the officer performed radio checks and issuance of the citation). We further find it relevant that when Immel asked King to sit in his patrol vehicle, he had King sit in the front seat, and made it clear that King was free to leave. King was therefore not under arrest, such that reasonable suspicion or probable cause was required to justify his placement in the patrol car. *Cf. id.* at 212 & n.18 (stating that reasonable suspicion is not required for the initial detention, without arrest, of a motorist in an officer's squad car).

King's second and primary argument is that Immel's questioning about his travel plans and drug possession constituted "on-scene investigation into other crimes" that deviated from the mission of the traffic stop, unduly prolonged it, and rendered King's detention unlawful. Appellant's Br., ECF No. 22, at 15–17 (cleaned up).

Immel began questioning King about his travel approximately two minutes and thirty seconds into the stop, continuing until about four minutes into the stop. At that point, King observed the K-9 vehicle, and interjected "You got another guy coming too? Some dogs next? You guys go ahead. I don't have shit." Exhibit 3, 3:57–4:03. Immel interpreted this as consent to conduct a free-air sniff around King's vehicle, and King does not dispute that he consented to the sniff. After this interjection, Immel questioned King about his possession of drugs for about a minute and a half, from approximately four to five and a half minutes into the stop. King remained in Immel's patrol car, answering additional questions about his travel plans, until approximately six minutes and eighteen seconds into the stop.

We conclude that this portion of the stop was justified and not unduly prolonged. Immel's initial questioning related to King's movements and travel plans. This questioning was permissible as part of the mission of the traffic stop. "Asking a few questions" is a "routine traffic-violation task[]," *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024), if these questions are "'context-framing' questions about [a defendant's] travel history and plans," as they were in this case. *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023) (quoting *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020)).

To the contrary, Immel's questioning about King's drug possession was, by Immel's own admission, unrelated to the traffic stop. But Immel's questioning did not unreasonably prolong the stop. While Immel asked about King's travel plans, he was in the process of verifying King's information, and he continued to do so while asking King if had various illicit substances in his vehicle. Immel's body camera footage shows him using the computer in his patrol car for the entire time that King was present in the front seat. Immel testified that he was using the computer to conduct routine checks verifying King's driver's license, insurance, and vehicle registration

information, and he searched police information networks and databases for King's name to check for warrants or additional drug investigations. These checks constituted "ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 575 U.S. at 355 (alteration in original) (internal quotation marks omitted). Because Immel questioned King while conducting these ordinary inquiries, the questioning did not unreasonably prolong the traffic stop. "[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he or another officer is completing a task related to the traffic violation." *United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020) (alteration in original) (quoting *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010), *abrogated on other grounds by Rodriguez*, 575 U.S. at 357). All of Immel's questioning of King in the patrol car—whether related or unrelated to the mission of the traffic stop—appears to have taken place during this "dead time."

King exited the patrol vehicle approximately six minutes and eighteen seconds into the stop, and he consented to a search of his person less than a minute later, approximately seven minutes and thirteen seconds into the stop. During this minute, troopers were still performing tasks within the mission of the traffic stop. While King was in Immel's vehicle, Metras was working to verify the active warrant against King's passenger and fiancée, Rosebush. Checking whether passengers have valid identification and any outstanding warrants is a task incident to the mission of a traffic stop. *See Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) ("We have held that checking passengers for warrants and brief questioning are permissible as part of a traffic stop."); *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) ("[I]t [was not] inappropriate for [an officer] to check both whether [the driver and passenger] had valid identification and whether they had any outstanding warrants."). Per the troopers' testimony, final confirmation of Rosebush's warrant did

13

not come in until seven minutes and five seconds into the stop. So, for these seven minutes, the stop was not unreasonably prolonged.

King additionally suggests that his detention was unreasonably prolonged when Immel searched his person. King does not dispute that he gave consent for the search, and that his consent was valid. We assume, without deciding, that Immel needed reasonable suspicion to ask King for consent to search his person and to affect the resulting search.[2] Proceeding with this assumption, we conclude that Immel had reasonable suspicion that King possessed or was trafficking drugs at the time of the search, sufficient to justify extending the stop.

Immel testified that at the time of the consent search, he had not completed tasks related to the traffic stop, like running King's trailer license plate through law enforcement databases. Nevertheless, Immel elected to first obtain consent to perform the search, and the search was not related to the mission of the stop. Instead, it was part of Immel's unrelated investigation of King for drug possession and drug trafficking. Thus, assuming that Immel's obtaining of consent to search, and the search itself, constituted an extension of the authorized seizure affected by the initial traffic stop, we must assess whether Immel developed reasonable suspicion of criminal activity sufficient to justify extending the seizure. *See Lott*, 954 F.3d at 923 ("A seizure can be

---

[2] We recognize precedential cases suggesting that officers may need less than reasonable suspicion to ask for consent to search a vehicle during a traffic stop. For example, in *United States v. Canipe*, 569 F.3d 597 (6th Cir. 2009), we held that an officer's "brief detention and request for consent to search the truck following" a concluded traffic stop "did not transform the legal traffic stop into an unconstitutional seizure." *Id.* at 602. Nor did the officer's consented search of the vehicle unreasonably prolong the stop, where we concluded that consent for the search was valid and the search was conducted within the scope of that consent. *See id.* at 602–06. We concluded that the officer's "continued detention and questioning" of the defendant were reasonable, in part, because the officer had reliable information that the defendant was engaged in criminal activity, and the defendant was evasive when questioned. *Id.* at 602. But we did not state that the officer had reasonable suspicion that criminal activity was afoot, nor that he needed it to ask for consent to search the vehicle.

Because we find that Immel had reasonable suspicion, we decline to opine further on the applicability of *Canipe* to this case.

extended if something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." (internal quotation marks omitted)).

"In deciding whether an officer conducting a traffic stop has developed a reasonable suspicion of criminal activity, we consider the totality of the circumstances." *United States v. Stepp*, 680 F.3d 651, 664 (6th Cir. 2012). "The officer must point to 'specific and articulable facts'" that amount to "more than an ill-defined hunch" that criminal activity is afoot. *Id.* (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).

In testimony, Immel identified four factors that contributed to his suspicion that King was engaged in criminal activity, specifically that he possessed and was trafficking methamphetamine: (1) Immel was acting on information, relayed by Detective Hodge, that "there were suspicions of methamphetamine being found or being in the car," Supp. Hr'g Tr., R. 119, Page ID #675; (2) Immel believed King to be under the influence of drugs; (3) King denied possessing several illicit substances when questioned, but was unresponsive when Immel asked if he possessed methamphetamine; (4) King said he traveled downstate in part to purchase a lawnmower, but gave dubious answers as to the specifics of his proposed purchase.

Some of these factors, considered alone, are weak indicators of criminal activity. But considered together, the totality of the circumstances supports the existence of reasonable suspicion. We discuss each factor in turn.

First, Immel received information from Hodge that King was on a suspected narcotics run, and Hodge informed uniformed troopers, when instructing them to attempt the traffic stop, that King was bringing methamphetamine from downstate to the Upper Peninsula. Taken alone, Hodge's relayed information does not provide reasonable suspicion to extend the stop. *Cf. United States v. Noble*, 762 F.3d 509, 522–25 (6th Cir. 2014) (declining to find reasonable suspicion that a driver

was armed and dangerous, as needed to support a frisk, when, among other weak indicators of danger, a detective had relayed that a "DEA Task Force suspected that the [driver's] vehicle was connected to methamphetamine trafficking"). But it did contribute, albeit minimally, to the quantum of reasonable suspicion. We have stated that when "criminal history reports . . . [are] specific and related to the same suspicions that the officer was developing," such reports can "cast[] a suspicious light on . . . otherwise weaker indicators" of criminal activity, "particularly when combined with . . . dubious travel plans." *Stepp*, 680 F.3d at 667. An example of specific information on a defendant's criminal history includes that he was "previously . . . investigated by the DEA for trafficking cocaine." *Id.* In this case, Hodge specifically relayed to Immel that he suspected King was a methamphetamine trafficker. Where Immel developed his own articulable suspicions that King was trafficking drugs, this information about King's history helps justify Immel's prolonging of the traffic stop for the consent search. However, we assign little weight to this factor, in part because Immel was additionally aware that King had been previously stopped, and the stop did not yield methamphetamine attributed to King.

Second, Immel testified that he believed King to be under the influence of drugs. Immel thought that King was under the influence because "he was nervous. His chest started to rise and fall. He was sweating, . . . he had mood swings[,] and [he] was very challenging." Supp. Hr'g Tr., R. 119, Page ID #670. Additionally, Immel believed that it was symptomatic of drug use that King, upon initial contact, attempted to hand over his driver's license without rolling down his window, displaying odd or evasive behavior. We have said that nervousness, by itself, is "a relevant but unreliable indicator" of criminal activity, "especially in the context of a traffic stop." *United States v. Calvetti*, 836 F.3d 654, 666 (6th Cir. 2016) (internal quotation marks omitted). But Immel articulated symptoms other than nervousness to suggest that King was on a stimulant, consistent

16

with his developing suspicion that King possessed methamphetamine in his vehicle. So, "although nervousness alone is insufficient . . . nervousness along with . . . erratic movements and deceptive behavior could reasonably lead an officer to conclude that [King] was under the influence of a stimulant," contributing to Immel's suspicion that King "was part of a drug-trafficking operation." *United States v. Collazo*, 818 F.3d 247, 260 (6th Cir. 2016).

Third, King denied possessing several illicit substances, but was unresponsive when Immel asked if he possessed methamphetamine. Immel also testified that King appeared nervous during this line of questioning, and this reaction, along with the lack of response, indicated to him that King was "possibly lying about having methamphetamine." Supp. Hr'g Tr., R. 119, Page ID #668–69. We concur with Immel's assessment that King's nonresponse was tellingly evasive. And we have often said that "evasive behavior is a pertinent factor in determining reasonable suspicion." *United States v. Blair*, 524 F.3d 740, 753 (6th Cir. 2008). Though we decline to hold that King's unresponsiveness alone provided reasonable suspicion, it was significant. King responded to several questions and affirmatively indicated that he did not possess marijuana, cocaine, or heroin. He specifically declined to respond to Immel's question asking if he possessed methamphetamine, the very substance that he was suspected of trafficking. While not an admission to the possession of methamphetamine, in context, King's evasiveness supports Immel's reasonable suspicion that he possessed the drug.

Fourth, Immel found King's account of his travel plans dubious, and King's explanation of his plans lacking. King told Immel that he traveled downstate to see his children, and to look at a lawn mower he intended to purchase. Immel specifically articulated that his suspicion was piqued because King could not name the model of the lawn mower. He further thought it suspicious that King returned to the Upper Peninsula without the lawn mower, apparently because the agreed-

17

upon price had changed. In previous cases, we have suggested that similarly dubious explanations contribute strongly to the quantum of reasonable suspicion, where an officer is able to articulate his reason for disbelieving the defendant. *See, e.g.*, *United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999) (district court did not err in finding reasonable suspicion when officer believed "that Defendants provided an implausible explanation for their trip" because they claimed to be relocating a military service person when it was the officer's experience that "people in the military did not have to move their belongings themselves when relocated"); *United States v. Rodriguez*, 485 F. App'x 16, 20 (6th Cir. 2012) (officer had reasonable suspicion to prolong a traffic stop in part because he doubted the defendant's explanation for his travels; the defendant stated he was going to his cousin's bachelor party, but he did not know the date of the wedding, and the party was allegedly taking place on a Thursday, which the officer believed to be an unusual night for a bachelor party).

Assessing the four factors Immel relied on as a totality, the circumstances demonstrate a reasonable suspicion that criminal activity was afoot. Thus, any expansion of the initial stop to obtain consent to search King, and to affect the search, was not unreasonable. *See Lott*, 954 F.3d at 923.

The drug dog began sniffing King's vehicle around seven minutes into the stop—as Immel was obtaining consent to search King—and alerted during the consent search of King's person. As discussed, the consent search was justified by reasonable suspicion, and King's detention during the prior seven minutes was justified under the scope of the traffic stop. So, the stop was not unreasonably prolonged to conduct the dog sniff. This case is thus unlike *Rodriguez v. United States*, on which King relies. In *Rodriguez*, the Supreme Court held that it was unconstitutional to extend an "otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a

dog sniff." 575 U.S. at 353, 358. In that case, a police officer conducted a sniff of the defendant's vehicle *after* "the reason[s] for the [traffic] stop [were] out of the way," therefore impermissibly prolonging the stop by seven or eight minutes—the time between the completion of the traffic stop and the dog's positive alert. *Id.* at 352–53 (first alteration in original) (internal quotation marks omitted). In King's case, we find no such impermissible delay. King was not detained to facilitate the dog sniff; rather, the dog sniff occurred simultaneous to intrusions justified by the purpose of the traffic stop, and to the search of King's person justified by reasonable suspicion. *Cf. id.* at 357 ("The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop." (internal quotation marks omitted)). The sniff thus did "not change the character of [the] traffic stop that [was] lawful at its inception and otherwise executed in a reasonable manner." *Caballes*, 543 U.S. at 408.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.